## THE LOUISIANA STATE BANK *v.* THE ORLEANS NAVIGATION COMPANY et al.

The nature of a contract depends entirely on the obligations it imports; its form is subordinate to its real character.

Express notice is not necessary to charge the holder with what the law considers to be notice of any defect or infirmity in a note or bill, so as to let in a defence against a holder for value; it is sufficient, if the attending circumstances are of such a positive and pointed character as to cast a shade on the transaction, and to put the holder on enquiry.

Where an endorsement is by an agent, or person not acting in his own right, and there is a direct reference in the body of the instrument to the procuration or authority under which the endorsement is made, one who holds the instrument by virtue of the endorsement is charged with notice of the power under which it is made. So in an action against a municipal corporation on an instrument endorsed by the corporation, on the body of which were these words : " In conformity with resolutions of the Council of said Municipality, bearing date the 29th July and 5th August last," the holder will be held to have had notice of the resolutions, and his right to recover will depend on their validity, and on that of the acts done under them.

Where in an action on a negotiable instrument the defendants put in issue the *bona fides* of the holder, by expressly charging privity, and notice of the original consideration on which they were issued, it is incumbent on him to show from whom, and for what consideration, he received it.

The existing municipalities of New Orleans, have not all the powers which belonged to the municipality of New Orleans under the french government of Louisiana, nor those of the *Cabildo* under that of Spain. Since the legislation in our Codes on the subject of corporations, the express delegation in the act of 17 February, 1805, organizing the city government, the radical change in our political system by the transfer of Louisiana from the French Republic to the United States, the repeal of the laws of Spain in 1828, and our own settled jurisprudence in relation to the political corporations of the State, it is useless to look for the powers of the municipalities elsewhere than in our Code, legislation and jurisprudence.

Sec. 13 of the statute of 17 February, 1805, incorporating the city of New Orleans, which provides that "the estates, whether real or personal, the rights, dues, debts, claims or property which heretofore belonged to the city, or were held for its use by the Cabildo under the spanish government, the municipality after the transfer to France, or the municipality now existing, shall be vested in the mayor, aldermen, and inhabitants," relates to rights of property and privileges incidental thereto, and not to the power of the corporation. Sec. 14 of that stat. which declares that, " all the legal ordinances of the present municipality, not incompatible with this charter, which shall be in force on the second monday in March next, shall remain in force until repealed or altered by the said mayor or city council; and all the powers at present vested in the mayor and municipality of the said city, shall continue to be

vested in them until the said second monday in March next," relates to the political powers of the corporation, which, after the day fixed for their termination, were superceded by the corporation organized under the charter.

The stat. of 17 February, 1805, incorporating the city of New Orleans, confers, in general terms, powers of administration, and, by its various special delegations of authority, excludes the idea of any other power being granted than such as the police, and preservation of good order among the population, require.

The powers of those charged with the local government of internal divisions of the State, and of cities and towns, are merely administrative, except where express authority has been given by law.  C. C. 420, 429, 430.

The word *canals*, in the 16th sec. of the stat. of 17 February, 1805, authorizing the "mayor and city council of New Orleans, to cause common sewers, drains, canals, pavements and bridges to be built and constructed in every part of the city," means canals for draining, and not for navigation.

It is not true, as a legal proposition, that for every act for which an agent may expend money for his principal, he can bind him in a contract of suretyship. The expenditure of money, and the loaning of the credit of the principal, are not governed by the same rules.  The power of the agent, as to the former, may be implied and incidental ; as to the latter it must be express, or necessarily implied from the nature of the mandate ; the former is a necessary function of administration, the latter is not within its limits.

Suretyship is a contract which carries with it lesion, by its very nature.

No express authority is given to the officers of the municipal corporations to enter into the contract of suretyship ; nor is there any general authority from which the power to enter into such an engagement can be implied, or fairly deduced, under a plea of usage, necessity or convenience, or public interest.

Where the powers of officers of municipal corporations have not been expressly determined, they must be regulated in the same manner as those of other agents (C. C. 430) ; and to bind the corporation, by drawing or endorsing bills of exchange or promissory notes, their authority must be express and special.  C. C. 2966.

The ordinances of the council of the First Municipality of New Orleans, of 29th July and 5th August, 1836, authorizing the mayor to endorse and guaranty, in the name of the municipality, certain bonds of the Orleans Navigation Company, exceeded the powers of those entrusted with the administration of the affairs of the municipality, and the endorsements made in pursuance thereof are not binding on the municipality.  The objects for which the endorsements were given—the improvement of the navigation of the canal and *bayou* St. John, and the improvement of the commerce in the part of the municipality in which the canal terminates, were objects for which the municipal administration had no authority to loan its credit.

The stat. of 18 March, 1839, ch. 40, relative to the city of New Orleans, expressly provides (sec. 6) that none of its provisions shall effect any loans or bonds made by any of the municipalities of that city, leaving their validity as before the passage of that act.

As a general rule a judgment in an action for interest, particularly when evidenced by a distinct obligation, will not have the force of *res judicata* between the same parties, in a subsequent suit for the principal, or other arrears of interest.  But if in a suit for interest the validity of the original contract is adjudicated upon, the judgment will be conclusive between the same parties.  Where, however, a case goes off on some matter of form, or some technical defect, it is obvious that the fact itself negatives the idea that the causes of action or defence are the same, or that the adjudication was on the contract ; and a case so terminated does not form *res judicata* in another suit in which the original cause of action is in controversy.

The laws organizing the government of a city are eminently laws for the preservation of public order, from the force and obligations of which individuals cannot derogate by their conventions.  C. C. 11.  Contracts made in violation of such laws are absolute nullities, not susceptible of ratification.

Where by the acts of a municipal corporation an obligation has been created on its part towards a third person *ex æquo et bono*, the creditors of the latter will be entitled to the benefit of it.

A corporation, being the creature of the law, possesses only those powers which the charter creating it confers, either expressly, or as incidental to its existence.

LOUISIANA STATE BANK v. ORLEANS NAVIGATION COMPANY.

LOUISIANA
STATE BANK
*v.*
ORLEANS NA-
VIGATION COM-
PANY.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. The facts of this case are stated in the opinion of the court *infrâ*.

*Grima*, for the plaintiffs.

*A. Hennen*, on the same side. Plaintiffs are *bond fide* holders of negotiable paper, for which a full consideration has been paid in the usual course of business. Both the defendants were capable of making such paper. That the Orleans Navigation Company could do so, results clearly from the general powers conferred on it by the second section of its charter, and the special obligation to pay its bills and notes, imposed in the 7th no. of the 6th section. That Municipality No. One could likewise do so, is shown by its notorious and daily exercise of such a power. They have both full corporate powers, and " in general an express authority is not indispensable to confer upon a corporation the right to borrow money, to deal on credit, or become drawer, endorser or acceptor of a bill of exchange, or to become party to any *other* negotiable paper. It is sufficient if it be implied, as the usual and proper means to accomplish the purposes of the charter." Angell and Ames on Corporations, 3d ed. 234. " All corporations, whether public or private, may issue negotiable paper for a debt contracted in the course of its proper business." 2 Kent's Com. 290, note a. 5th ed. If banks or individuals, taking the notes or endorsements of the municipality, were obliged constantly to examine into the transactions on which they were founded to discover if they are within the powers granted by charter to the municipality, there would be no safety in dealing in their negotiable paper.

But suppose that the plaintiffs took these bonds with a full knowledge of the contract under which they were issued, it may be clearly shown that the municipality did not exceed its powers in endorsing these bonds for the purposes contemplated by the contract. The legislature evidently considered that the municipality had the power to become accommodation endorsers ; for it enacted : " That hereafter it shall not be lawful for either of the councils of the municipalties of the city of New Orleans, to issue its obligations having longer than one year to run, for the purpose of borrowing money, without the special authorization of the legislature ; nor shall it be lawful for said councils to endorse or guaranty any bond, or other obligations, for any incorporated company, association or individual, nor to be interested in any manner, either directly or indirectly, in the responsibility or undertakings of such companies, associations, or individuals, without being first sanctioned by law : provided, that the loans or emissions of bonds of either of the municipalities now authorized by ordinances or resolutions anterior to the passage of this act, shall not be affected by any of the provisions contained in it." Acts of 1839, page 96.

But in order to ascertain the corporate powers of Municipality No. One, recourse must be had to the various acts of incorporation in which they are granted ; and which almost constitutes a history of the city of New Orleans. By an act of the legislature, approved the 8th March, 1836, the city of New Orleans was divided into three separate sections, each with distinct municipal powers. Bullard and Curry, p. 120. By the second section of the same act, " each municipality of said city shall be governed, and its affairs administered by a council ; and all the powers now vested by law in the city council of New Orleans, shall appertain to, and be vested in, and be exercised by the councils of each of the municipalities created by this act, within their respective limits." By the 4th section, " each of said municipalities of the city shall possess separate corporate rights, and are hereby declared to be distinct corporations, and shall possess generally all such rights, powers and capacities as are usually incident to municipal corporations ; shall have a seal, and the same may alter and renew at pleasure ; shall be capable of suing and being sued : of acquiring by onerous and gratuitous title all kinds of property, real, personal and mixed ; of enjoying, alienating, mortgaging and otherwise disposing of the same ; and in general shall possess and exercise, within their respective limits, all such powers, rights and privileges, as are now possessed and exercised by the corporation of New Orleans." By the 10th section it is enacted that, " all laws of this State conferring rights and powers, and imposing duties on the corporation of New Orleans, or otherwise providing for the government thereof shall continue in full force, in each of said municipalities respectively."

From this we must go back to the act incorporating the city of New Orleans, passed on the 17th day of February, 1805. Territorial Acts, vol. 1, p. 44.

The first section of this act declares that all that tract of country included within certain boundaries "shall continue to be a city by the name of New Orleans," and "all the free white inhabitants thereof shall be a body corporate, by the name of mayor, aldermen, and inhabitants of the city of New Orleans." By the 13th section of the act, "the rights which heretofore belonged to the city of New Orleans, or were held for its use by the Cabildo, under the spanish government, or the municipality, after the transfer of the Province in 1803 to France, or the municipality now existing, shall be vested in the said mayor, aldermen, and inhabitants." By the 16th section it is made "lawful, for the said Mayor and City Council, to cause common sewers, drains, canals, pavements and bridges to be built and constructed in every part of the said city, and for such purpose the said council may purchase ground of any person and body corporate." By the following section it is enacted "that all moneys paid for the purchases of ground bought as aforesaid, as well as the charges of opening, pitching, paving, and regulating such streets, and the expenses for the construction of common sewers, drains, canals, pavements, and bridges. shall be paid by the said Mayor or City Council, out of the city funds." From these enactments, it is evident that Municipality No. One has the power of constructing all kinds of canals whatsoever, besides sewers and drains, within its limits. By the act incorporating the Orleans Navigation Company, 1st section, the company was established for the purpose of improving the inland navigation of the territory of Orleans; and by the 9th section, they were empowered to improve the navigation of the bayou St. John, and the Canal Carondelet up to the basin, terminating the same at the city ditch : and also to continue the same thence to the river Mississippi; and by the 13th section of the same act, the company was authorized to construct a road from the lake up to the bayou bridge. 2 Territorial Acts, 4. By the 14th section, the city of New Orleans was authorized to subscribe for one hundred shares of the stock of the company, which by the evidence it did. It is clear from the charter to the Orleans Navigation company, that the city could not interfere in any way with the navigation or the improvement of bayou St. John or the Canal Carondelet, for the improvement of which the company was authorized to charge toll ; and by a decision of the late Superior Court of the Territory of Orleans, 2 Mar. R. p. 214, it was decided in a suit between the city and the company, that the former had no right to use the canal for the purpose of drainage.

Now, had the Orleans Navigation Company never existed, would not the city have possessed the power of constructing a canal communicating between the bayou St. John and the city, which was all within its limits, for the benefit of its inhabitants? The testimony establishes the great utility and benefit such a canal imparts to the municipality. But the professed object in the contract between the municipality and the company, was to raise money on the bonds of the company and the endorsement of the municipality, and, in the terms of the contract, "for the benefit of the said Orleans Navigation Company and the said Municipality No. One, and in order to cause commerce to prosper in that part of the said Municipality No. One." These were the legitimate objects, and the testimony shows that the proposed plan of realizing them was judicious and practicable. The municipality took every precaution to secure the accomplishment of them. The books of the company were, by express stipulation, subject to the scrutiny of the municipality, that the manner in which the funds were applied might be always known, and a particular officer was to be appointed for the inspection and supervision of the works. Besides this, the company pledged and mortgaged every species of its property, real and personal, to insure the execution, on its part, of the obligations of the contract. Thus it is seen, that the objects of this contract were in every way legitimate, and that every precaution was taken to secure their due execution. The municipality has never made any objections to the manner in which those funds were expended.

For what purpose was the municipality incorporated? "The corporation of a city is a public corporation, created for a political purpose." 2 Kent's Com., 275. "The duties of all bodies politic may be reduced to this single one, of acting up to the end for which they were created." 1 Black. Com., 479, 480. "The use of communities or corporations is to contribute to the promotion of some public advantage; and the first rule of their policy is, that they are advantageous and useful to the State." Code of 1808, p. 86, art. 3, translated nearly *verbatim* from Domat, Droit. Public, l. 1, t. 15, s. 1, n. 3, s. 2, n. 1.

*Margin note:* LOUISIANA STATE BANK v. ORLEANS NAVIGATION COMPANY.

"L'usage des communautés ou corporations est de pourvoir à quelque bien utile au public ; la première règle de leur police est, qu'elles soient etablies pour quelque avantage et quelque utilité à l'Etat." Municipality No. One has all the powers of the city of New Orleans: the city of New Orleans had all the powers which belonged to the municipality under the french government, and to the Cabildo under that of Spain. This follows from principles universally recognized as correct, and is directly laid down in *Lutterel's* case : " If a corporation have franchises or privileges by grant or prescription, and afterwards they are incorporate by another name as where they were bailiff and burgesses before, they are made mayor and commonalty ; or prior and covent before, and afterwards are translated into a dean and chapter ; although in these cases the name and quality of their corporation be altered and changed. and chiefly in the case of prior or covent, for of regular, who are dead persons in law, they are made secular ; yet the new body shall have all the franchises, privileges and hereditaments which the old corporation or body politic had either by grant or by prescription, for no person shall be prejudiced thereby." Vide 14 H. 6, 12, 37 Ass. 6, 38 Ass. 22, 39 H. 6, 15, 4 Coke's R., 87 b.

The powers of municipalities under the french government, are fully set forth by Domat, Droit Public, l. 1, tits. 15, 16. They embrace every thing which concerns the police and public good of cities, and are established not only for the common good of the inhabitants of the city, "mais aussi pour le bien public de l'Etat, qui se tire en plusieurs manières de celui des villes." T. 15, s. 1, n. 3. To these usual and ordinary powers, were added also those of a more extended character, and which are denoted as extraordinary by the same author, who instances the power of a municipal corporation to order a celebration of the success of the State by a public festival, and its rights to provide by taxation for the subsistence of the poor, the quartering and transporting of soldiers, and the reception of some public character, as a governor or general. The powers of the Cabildo were even more extensive : " El Cabildo es y representa todo el Pueblo, y tiene la potestad suya como su cabeza.... Los cabildos pueden lo que el Pueblo junto." Curia Filipica, *verbo* Cabildo, No. 7. The definition of the Cabildo is, " el congresso ó junto de las personas destinadas para el gobierno político y judicial de los pueblos." Teatro de la Legislacion Universal de España é Indias, 542; where are to be found the laws of Spain and of the Indies, defining their powers; among which will be seen an Auto Accordado, granting power, " para comprar caballo padre á costa de los propios." See 1 Prescott's Ferdinand and Isabella, 44, 48, 53, 56. 2 Kent's Com., 270. Angell and Ames, 10, 19, 3d ed. For the powers of the Cabildo of New Orleans, see 2 Gayarré's Histoire de la Louisiane, 384

It is conceded that all the powers of the Cabildo are not now held by the city of New Orleans, because its political and judicial powers have been absorbed, in a great measure by the federal and state governments; but enough remains for the purpose contemplated by the contract presented to the court; and the municipality, of itself, had the Orleans Navigation Company never existed, could certainly have cleared the bayou and the canal, and improved their navigation for the purposes which formed the motive of the contract between it and the company. If then the municipality had the power to expend its funds to secure a legitimate object; if directly, it could have employed men, and purchased materials for this purpose, surely it could indirectly secure the same object by assisting another to do it; and instead of expending money, it could lend its credit, particularly when it took what was then considered as ample security against all loss; for if the municipality was capable of the more burdensome act, *a fortiori* it was capable of the less burdensome. But the object of the contract has in a great measure being attained, and the testimony shows that the municipality has exercised its power beneficially for its inhabitants. This contract was passed in the same year in which the city was divided into the present municipalities. From that division, the municipality defendant was bounded below and above by its sister municipalities, on one of the remaining sides by the river, and on the other by the lake. Thus situated, the only direction in which it could expand was in the rear, towards the lake. The ground along the canal and the bayou, within its limits, could be rendered habitable by drainage ; and it became important, in view of such an event, to secure the cheapest conveyance of building materials to that quarter, and to increase its value by promoting its commercial facilities.

The plaintiffs gave in evidence, the record of the suit by the Municipality

No. One against the Orleans Navigation Company, which conclusively estab-
lishes certain facts bearing most materially upon the decision of this case.
That record shows that the municipality has heretofore set up the same de-
fence against the *coupons*, as that advanced in the present case. The judge of
the commercial court, gave judgment against it for the payment of the interest
due.    That judgment the municipality has never appealed from, but has vol-
untarily satisfied: moreover, it uses that judgment, based upon the contract,
against the Navigation Company, and, by virtue thereof, has seized, sold, and
purchased all the property mortgaged.    This proceeding estops the munici-
pality from setting up the illegality of the contract: for it acquiesced in the
judgment upon the contract against itself, which it voluntarily satisfied;
and afterwards it declared upon the contract as legal and binding, prose-
cuted it to judgment, and realized that judgment by the seizure and sale of the
property mortgaged under the contract.    As regards the judgment offered by
Municipality No. One, annulling the second series of bonds that had been
issued under that contract, it is sufficient to say that it was *res inter alios acta*
for another series of bonds; and cannot in any way affect the plaintiffs, as holders
of the first series, in which both the parties to the action, and its subject matter,
were different.

The late Supreme Court has in two memorable instances, carried the powers
of Municipality No. One to contract and bind itself by bond, to a much further
extent than is sought for in the present instance.    See the cases of the *First
Municipality of New Orleans* v. *The Orleans Theatre Company*, 2 Robinson's
Rep., p. 209, and *The First Municipality of New Orleans* v. *McDonough*, in the
same vol., p. 244.    In the first of these cases, the Municipality No. One had
subscribed for stock to the amount of $200,000, for the purpose of building a
Theatre, and forming an Insurance Company; the legality of that subscription
was enforced by the judgment of the court.    In the second case, the same
municipality, having purchased property on speculation, for the purpose of
improving the municipality, issued its bonds in payment for $247,000, and the
contract was adjudged legal and binding.

*Roselius*, for the appellant.    I. Had the Council the power to endorse or
guaranty the payment of the bonds of the Orleans Navigation Company?

In considering this proposition, no distinction can be made, whether the en-
dorsement be given to a private corporation or to a natural person.    To solve
the question here proposed in the affirmative, we must come to the conclusion
that the Council of the Municipality has the unlimited power to become surety
for whomsoever, and to whatever amount, it may please the majority of the
members!    Those who advocate doctrines so novel in their character and ruin-
ous in their tendency, are bound to point out the law by which such extravagant
powers have been delegated to the Council.    For this, I have called in vain.
In the absence of any law, from which the power can be deduced, an effort is
made, in the first place, to support it by an argument founded on the applica-
tion of general principles to municipal corporations; and secondly, by an asser-
tion that the Councils of the respective Municipalities possess the same powers
which were vested in the *Cabildo* under the spanish government.    In both of
these attempts, the counsel have failed.    As regards the first position:

All corporations are the creatures of the law, and possess no powers or capa-
city except such as have been conferred on them by their charter.    I admit the
doctrine of express and incidental powers of corporations, to its fullest extent.
What is insisted on is, that a political corporation can exercise no power unless
it has either been expressly delegated to it, or is indispensably necessary as a
means of attaining the object of its creation.    It has already been shown that
there is no express delegation of the power to endorse the bonds, or guaranty
the payment of debts due by private individuals or corporations.    The only
inquiry therefore is, whether it is a necessary or indispensable means to carry
into execution some one of the powers possessed by the Municipality?    It is
contended by the counsel for the plaintiffs that the 16th section of the charter
of the city of New Orleans contains provisions which will support the argu-
ment of implied or incidental powers, on which they rely.    The part of the
section referred to, is as follows: "It shall be lawful for the Mayor and City
Council to cause common sewers, drains, canals, pavements and bridges to be
built and constructed in every part of the said city, and to order and direct the
ditching, filling and opening, widening and continuing any of the streets there-
of, &c."

LOUISIANA
STATE BANK
*v.*
ORLEANS NA-
VIGATION COM-
PANY.

LOUISIANA
STATE BANK
*v.*
ORLEANS NA-
VIGATION COM-
PANY.

From the whole context of the section under consideration, it is plain that the word " canals" is used in almost the same sense as the expressions " sewers" and " drains," which immediately precede and follow it.

Admitting, however, for the sake of the argument, that the municipality possesses the power of making canals for purposes of navigation, does that confer the implied or incidental power to endorse bonds, to enable the Orleans Navigation Company to enlarge its canal?

To give a coloring to this transaction, it is recited in the contract, that the undertaking was "for the benefit of the said Orleans Navigation Company, and the said Municipality No. One, and in order to cause commerce to prosper in that part of the said Municipality No. One." If, under the specious pretext of " causing commerce to prosper, &c.," the Municipality Council can endorse bonds to the amount of $200,000, they may, with equal propriety, endorse or guaranty the payment of my notes to any amount, on condition of my erecting a certain number of fine buildings in a particular street, and thereby improving or embellishng that part of the city. The passage quoted from Kent's Commentaries, that "all corporations, whether public or private, may issue negotiable paper for a debt contracted in the course of its proper business," has no bearing whatever on the question we are discussing. No one ever disputed that a corporation could issue a negotiable note, as an acknowledgment or evidence of a debt due by it. But the question is widely different, whether a municipal corporation can become the surety for the payment of debts due by others.

The argument founded on the 13th section of the act of 1805 cannot stand an examination. It is said that this section transferred to the City Council all the powers of the Cabildo. But it is too clear to admit of doubt that the word " rights" is used in a very different sense from that which the counsel attribute to it.

Be this as it may, all doubt must be dispelled by the explicit language used in the 6th section of the same law, which expressly defines the powers of the corporation.

This is the only source of the powers and capacity which have been bestowed on the corporation of New Orleans, with the exception of the provision in the first section of the act of 1805, that it " shall be capable of holding and conveying any estate, real or personal." And it is obvious that the specification of certain powers in the subsequent sections of the law, is a mere developement of the fundamental rules laid down in the section just quoted.

It is deemed unnecessary to multiply authorities on the question of the powers and capacities of corporations. A reference to some of the leading cases, however, may not be amiss. Before doing so, however, it is proper to notice the two cases cited by the counsel for the plaintiffs. The first of these is: *The First Municipality* v. *The Orleans Theatre Company*, 2 Rob. 209. In that case it was decided, " that a subscription by a municipal corporation to the stock of an incorporated company, though unauthorized by the charter of the municipality, will be binding on it, if subsequently sanctioned by the legislature." That case turned on the act of the legislature of the 11th of March, 1837, ratifying the subscription to the Theatre company stock by the First Municipality. It was conceded that, without this law the subscription would not have been binding on the corporation. So far, therefore, from sustaining the position taken by the plaintiffs, it supports, on the contrary, the doctrine which is maintained by the defendants.

The other case is that of the *First Municipality* v. *McDonogh*, in the same volume, p. 244. The only point decided in that case was, that " under the act of 8th of March 1836, dividing the city of New Orleans into three municipal corporations, each of the municipalities is authorized to acquire, enjoy, alienate, mortgage or otherwise dispose of all kinds of property, real, personal, or mixed ; and such purchase may be for cash, or for a price payable at a future period." The decision rested on the express power delegated to the corporation to buy and sell property.

Let us now refer to some of the leading cases in which the doctrine of the powers and capacities of corporations have been examined. In the celebrated case of the *Trustees of Dartmouth College* v. *Woodward*, 4 Wheaton's Rep., 518, the rule laid down is that, "a corporation, being the mere creature of the law, possesses only those powers which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as

are supposed best calculated to effect the object for which it was created." In the case of *Clarke* v. *The Corporation of Washington*, 12 Wheaton, 40, it was decided that: "Municipal corporations, acting within the limits of the powers conferred upon them by the legislature, in the exercise of a special franchise granted to them, and the performance of a special duty imposed upon them, are responsible for the acts and contracts of their agents, duly appointed and authorized, within the scope of the authority of such agents; in the same manner as other corporations and private individuals are responsible on their promises, express and implied." So in the case of *Head* and *Armory* v. *The Providence Insurance Company*, 2 Cranch, 127. "In its corporate capacity, a corporation is a mere creature of the act to which it owes its existence: it may correctly be said to be precisely what the incorporating act has made it; to derive all its powers from that act; and to be capable of exerting its faculties only in the manner that act authorizes."

II. The counsel for the plaintiffs contend that the endorsement of the bonds in question has been ratified, by the payment of the judgment rendered by the Commercial Court for interest due on the bonds. It is difficult to conceive how the nullity of a contract, resulting from the absolute incapacity of one of the parties to it, can be remedied by any ratification of the party laboring under the incapacity. Besides, the judgment was rendered against the Municipality in that suit, because the nullity of the contract was not pleaded, in consequence of which the judge refused to decide the question whether the endorsements were binding on the Municipality or not. The satisfaction of the judgment under these circumstances was not voluntary.

The judgment of the court was pronounced by

EUSTIS, C. J. The defendants are sued on several interest *coupons*, annexed to certain bonds or notes issued by the Orleans Navigation Company, in September, 1836, and endorsed by the Municipality No. One, through their proper officer. The Navigation Company made no defence. The Municipality has pleaded that, in endorsing these instruments, the municipal government transcended its powers, and that its acts in this respect are null and void; that the endorsements were purely accommodation endorsements, and no consideration for them ever was received by the Municipality.

There was judgment for the plaintiffs, and the Municipality has appealed. The reasons for the judgment are given by the judge who decided the case, and are as follows:

"The defendants sued on certain interest certificates or *coupons*, annexed to bonds or notes given by the Navigation Company, and endorsed by the Municipality, plead: by the Navigation Company, a general denial: by the Municipality, that the notes were endorsed merely as accommodation notes, there being no consideration; that the Council of said Municipality transcended their powers, and that their acts were null and void; and lastly, that the contract had been annulled by a judgment of the parish court.

"As the Navigation Company have made no defence, and as I find the decree of the parish court was rendered in a suit to which the plaintiffs were not parties, and concerned another series of bonds, and in the case of *bonâ fide* holders of negotiable paper, the matter is reduced to that which questions the authority of the Council to enter into the contract, under which these notes or bonds were issued and endorsed. Admitting that the Municipal Council have no power to give accommodation endorsements, or rather, as was urged in argument, to endorse notes, I do not find the evidence presents a case of endorsements of that character, still less one without consideration. It is true the charter gives no power to endorse notes: It gives the power of taxation for certain objects; but there is no negative provision declaring that the funds of the corporation may not be anticipated, or that no expenditure be made until the money arising from taxation be actually in the treasury. Indeed cases

LOUISIANA STATE BANK v. ORLEANS NAVIGATION COMPANY.

might arise in which such a construction might be destructive of the public in. terest, e. g. in case of a crevasse. The uniform construction given to this power, not only in the municipal government of this city, but in almost all others, of anticipating their means, in other words by using their credit in the shape of contracts where payment is to be made at a future day, or perhaps by the issue of bonds or notes, has been so long acquiesced in that it is too late to question it. These corporations have had the benefit of it in the day of prosperity, and no objection has been made though the power has doubtless been greatly abused in many instances. A very clear case should be made out, to excuse them when the day of payment comes round. So strongly was our legislature impressed with these views that, in 1839, (Acts p. 96, sect. 6,) they provided, " that hereafter it shall not be lawful for either of the councils, &c., to issue its obligations having longer than one year to run, for the purpose of borrowing money, without the special authorization of the legislature. Nor shall it be lawful for said councils to endorse or guaranty any bond or other obligation for any incorporated company or individual, nor to be interested directly or indirectly in the undertakings of such companies or individuals, without being first authorized by law, &c." The highest judicial authority has also acknowledged it in more than one instance. Whether the form of credit be that of a notarial act, a mortgage, a bond, or promissory note, I hold to be utterly immaterial—whether by becoming principal or surety, or drawer, or endorser, it is the same thing, provided the object to be attained be within the Municipal powers. See Angel and Ames on Corporations.

" The — section of the charter provides that, it shall be lawful for the ." Mayor and Council to cause to be made in every part of the city common sewers, drains, canals, pavements and bridges ;" and sect. — authorizes them " to raise by tax such sums of money as may be necessary to supply any deficiency for lighting, cleaning, paving and watering the streets of said city, for supporting the watch, the levée, the prisons, workhouses and other public buildings, and for such other purposes as the police and good government of the city may require." It has been contended in argument that the power to make " drains, canals, &c.," is to be restricted " to canals for draining, and does not include canals for navigation." I find nothing in the terms to authorize such a distinction. The terms of the clause discountenance it. If such had been the object, the term, " drains" would have sufficed. The additional term " canals" implies something more ; it includes canals for navigation, of which the subject of the present suit furnishes ample proof.

" The canal Carondelet has been an object of great interest and importance, since the days of the spanish governor, whose name it bears. It was then the only outlet from the city to the bayou St. John, through which the whole lake trade passed, as it is now the only one by which the increasing trade with the Florida parishes, the coast of Mississippi, Alabama, and East Florida, can reach this municipality. Its success would enhance the property of the municipality in its vicinity, as well as all other in the neighborhood. It is a matter of public convenience and utility. I have no doubt that the powers of the city council were sufficient to have made this canal, if none had existed there. But this they could not do ; the right was vested in the Navigation Company. The city could not even enlarge it, without the consent of the company. To do this, and to improve that navigation, was I think an object worthy the attention of the council. The means of the Navigation Company could not accomplish it. Why could they not effect it, by aiding the company ? If the first contrac-

tor for paving the streets, had asked the council to guaranty 'drafts on him for the materials shipped from the north—who was ready to repudiate the debt, and declare that the charter did not authorize the acceptance of bills of exchange? It will not do to test the case by the result. It has been disastrous to both parties. That cannot change the question of right. Had the undertaking been successful, there would not have been any litigation. The city council took what they deemed the necessary precaution against loss by a mortgage on the property of the company, and it has now become that of the municipality. I conclude they had the power. It is therefore unnecessary to examine the very ingenious argument on the question of ratification.

Louisiana
State Bank
v.
Orleans Na-
vigation Com-
pany.

" I give judgment for the plaintiffs for the sum of $12,000. That the same judgment be entered in the suit No. 6795, for the sum of $18,000, making together $30,000, with interest at five per cent from date of protest, and costs of suit, against the defendants severally or *in solido*."

This case has been argued at bar with the care and learning which its importance required, and the responsibility devolves upon the court of determining the questions involved in it, which are among the gravest that can be submitted to a judicial tribunal. That which is directly presented for decision is, whether the contract made by those entrusted with the government of the municipality is one of those which they had the power to make, and creates a debt on the part of the carporation itself, which the corporators can be lawfully taxed to pay; for if there was no lawful authority to contract the debt, and the corporation has received no benefit from it, and no obligation exists, *ex æquo et bono*, on its part to pay it, so far as the action of this court can extend, all other considerations appear to be entirely foreign to the subject to be examined.

I. The contract on which the plaintiffs have brought this action is one of suretyship; it is an accessory promise to satisfy a debt, provided the principal debtor does not, under the conditions required by the negotiable form into which the contract is thrown. The nature of a contract depends entirely on the obligations it imports; its form is subordinate to its real character. The law contemplates and provides for the case of the modification of the contract of suretyship by the various conventions of parties, which their convenience may suggest; but when, in point of fact, the contract is one of suretyship, the law holds the parties to its rules and principles. Civil Code, 3006, 3014. The whole system of accommodation signatures is founded on this principle.

II. But it is said that the plaintiffs had no concern with the contract between the original parties; that the bank appears before the court as the *bonâ fide* holder of negotiable paper, for which a full consideration has been paid in the usual course of business; that both the parties defendant were capable of making such paper, and that it is part of plaintiffs' business to deal in it. The counsel has quoted in support of the legal proposition from Angell and Ames on Corporations, 3d edit. 234, and 2d Kent's Commentaries, 290, *note* a, 5th edition. The first says: " In general an express authority is not indispensable to confer upon a corporation the right to borrow money, to deal on credit, or become drawer, endorser, or acceptor of a bill of exchange, or to become party to any other negotiable paper. It is sufficient, if it be *implied as the usual and proper means to accomplish the purpose of the charter*." The second says that, " all corporations, whether public or private, may issue negotiable paper for a debt contracted in the course of its proper business."

Deferring for a moment the consideration of these authorities, but bearing in mind the positive limitation contained in each, it is necessary to enquire into the

LOUISIANA
STATE BANK
*v.*
ORLEANS NA-
VIGATION COM-
PANY.

question of fact, whether the plaintiffs be *bonâ fide* holders of a negotiable instrument, without notice. That the bank bought the bonds for a fair price, and that their purchase was a regular business transaction, is conceded. But in the body of the bonds, in a separate sentence, are written these words : " In *conformity with resolutions of the City Council of said Municipality, bearing dates on the 29th July and 5th August last.*"

It appears to be settled, that express notice is not necessary in order to charge the holder with what the law considers to be notice of any defect or infirmity in the bill itself, so as to let in a defence against a holder for value ; and it is sufficient if the attending circumstances are of such a positive and pointed character as to cast a shade on the transaction, and to put the holder on inquiry. *Lanfear* v. *Blossman*, 1 Annual Reports, 156. Story on Bills, § 194. It would seem to be evident and reasonable that, where the endorsement is by an agent and a person not acting in his own right, and there is a direct reference in the body of the instrument to the procuration or authority under which the endorsement is made, a person who holds the instrument by virtue of the endorsement is charged with notice of the power under which it is made. We must therefore consider the plaintiffs cognisant of the resolutions of the city council of the 29th July, and the 5th of August, and that the right to recover depends on the validity of those resolutions, and the acts done in virtue of them.

It is a circumstance which the court cannot permit to pass without observation that, no evidence was offered as to the person from whom the bank purchased the bonds. The important bearing which this fact might have had upon the cause is obvious ; for, if they were taken from the Navigation Company, the bank would be held privy to the original contract ; and, in any view of the subject, the equity of the case would be strengthened, if the bonds were purchased from a stranger to it.

The defendants having put in issue the *bonâ fides* of the holders of the bonds, by expressly charging privity and notice of the original consideration on which they were issued, the burthen of proof was thrown on the holders under the attendant circumstances, and it was incumbent on him to show from whom and for what consideration they took them. Bailey on Bills, 350. *Patterson* v. *Hardacre*, 4 Taunton, 114. Chitty on Bills, 639. The omission of this fact, under the view we have taken, has no material effect on the cause.

III. This brings us to the consideration of the question upon which the district judge decided the cause, and which has been argued at bar, concerning the power of the city council to authorize the endorsement and guarantee of the bonds.

In the printed argument of the counsel for plaintiffs, the proposition is maintained that, the municipality had the power to become accommodation endorsers, and that the legislature itself had placed this construction on its powers; and the various acts of the legislature have been referred to, which have regulated and defined, at different periods, the powers of the city government of New Orleans. It is said that the municipality, within its corporate jurisdiction, has all the powers which belonged to the muicipality of New Orleans under the french government, and the *cabildo* under that of Spain. If this were so, we should conclude from the examination we have been able to give to the subject, that the fact would operate rather as a restriction than an extension of the powers of the municipality, provided the limitations imposed by the french and spanish laws were also considered; but after the legislation

we have in our Codes on the subject of corporations, the express delegation of powers in the original act organizing the city government in 1805, the radical change in our political system ·by the transfer of Louisiana from the French Republic to the United States, the repeal of the laws of Spain in 1828, and ·our settled jurisprudence in relation the political corporations of the State, it becomes useless to look for the powers of the municipalities elsewhere than in our Code, our legislation, and our jurisprudence.

But the charter, which the act of 1805 is called, is express on this subject. The thirteenth section, under which this extraordinary pretension is claimed, provides, that the estates, whether real or personal, the rights, dues, debts, claims, or property which heretofore belonged to the city, or was held for its use by the Cabildo, the municipality as existing under the french government, or by the municipality then existing, shall be vested in the mayor, aldermen and inhabitants of New Orleans—the corporation organized by the act. But the very next section provides, that the legal ordinances of the then existing municipality not incompatible with the charter, which shall be in force on the second monday of March then next ensuing, shall remain in force until they shall be repealed or altered, and that all the powers at present vested in the mayor and municipality of said city shall continue to be vested in them until said second monday in March. The former section evidently relates to rights of property and privileges incidental thereto, and the latter to political powers, which, after the day fixed for there duration, were superseded by · the organization which the charter created. It remains to consider this organization, in relation to the power under which the bonds of the Navigation Company were endorsed by the officer of the municipality.

New Orleans, the capital of the province of Louisiana, was a city under the royal governments of France and Spain, was created a municipality under the ephemeral dominion of the consulate, and received its political organization from the late territorial government of Louisiana in February, 1805. The act *to incorporate the city of New Orleans,* of the 17th of February of that year, like all the statutes passed at the commencement of the american government in Louisiana —to the honor of their authors be it said—is a model of legislative style, and exhibits its intendment with a clearness and precision which renders it impossible to be misunderstood. It provides for the civil government of the city, and, in general terms, confers powers of administration, and in the various special delegations of authority it contains, thereby excludes the idea of any other powers being granted than such as the police and the preservation of good order of the population require. The powers to conduct the internal affairs of the city are ample ; but there is no expression which confers any power beyond this limit. It prescribes the duties of the principal officers, and desig-, nates specially the objects for which money may be raised by taxation, as well as the objects of taxation. The whole tenor of this act is a delegation of power for purposes of municipal administration, guarded by limitations, and accompanied by such checks as experience had shown to be wise, expedient, and even necessary for the interests of those who were to be affected by it.

In section 23, of art. 6 of the constitution of 1812, it is provided that :— " The citizens of the town of New Orleans shall have the right of appointing the several public officers necessary *for the administration and police* of the said city, pursuant to the mode of election which shall be prescribed by the legislature, provided that the mayor and recorder shall be ineligible to a seat in the general assembly." In the act of 1805, before recited, the legislature expressly

LOUISIANA STATE BANK<br>
*v.*<br>
ORLEANS NAVIGATION COMPANY.

39

reserved to itself to alter and amend the charter, as it is called, whenever it shall be deemed proper.

The municipal administration of New Orleans, like the police jury in each parish, formed one of the sub-divisions of the internal administration of the State, and was absolutely under the control of the legislature. The only constitutional power which it possessed was, the right of the inhabitants to elect their public officers. The constitution of 1845 recognized this power. By the act of March, 1836, the city was divided into three municipalities, and each municipality was vested with the rights, powers and privileges within its limits which appertained to the ancient corporation of New Orleans. The different acts of the legislature passed between the year 1805 and the division of the city in 1836, we shall notice when we are examining the argument by which the claims of the plaintiffs are supported.

The Orleans Navigation Company was chartered by the territorial legislature of Louisiana, which then consisted of the governor and legislative council of the territory of Orleans, in July, 1805, after the act incorporating the city of New Orleans. Its object was the improvement of the inland navigation of the State—then a Territory, and its powers extended over the whole State; but, by an act of the 3d March, 1814, it was restricted in its operation to the improvement of the internal navigation of the *Island of Orleans*. Its capital was fixed at $200,000.

The Navigation Company have a charter in the proper legal sense of the word, and, after the act of the legislative council had received the ratification of Congress, there can be no question as to its validity; indeed it has been frequently recognized in our courts, and also by the legislature of the United States. Its powers for its legitimate purpose—that of improving the navigation, are most ample. 11 Mart. R. 309. *The State* v. *The New Orleans Navigation Company*, 19 La. 269. 2 Mart. 10, 214. The main object to which the operations of the company was directed was the opening of a communication between the waters of the *bayou* St. John and the Mississippi. Possessing the canal Carondelet, which terminated in the former, the means of extending the water communication to the river was afforded to the company by the government of the United States, by granting permission to cut a canal in the middle of Canal street. All this was within the limits of the city; and thus we have the two corporations with separate and distinct powers, and one operating within the territory and jurisdiction of the other.

If the acts before mentioned are perused with attention, it is scarcely possible to mistake the well defined purpose of the law giver. One was a delegation of authority to conduct the administration of a city, and the other a charter to improve the water communication within its limits, each as separate and distinct from the other as it well could be. And that there should remain no possible doubt as to the intendment of each act, a provision is made in the charter of the Navigation Company for an union of interest between the city and the company *in a certain contingency*. Section 14th of the charter provides that, "one hundred shares in said corporation shall be reserved for the Bank of Louisiana, and one hundred other shares for the *city of New Orleans*, provided that said bank and said city shall signify their wish to subscribe for the stock, within six months from the passing of this act." This authorized connection of the city with the Navigation Company by the permission given of becoming a stockholder for a limited number of shares, is mentioned as an argument in

favor of the plaintiffs view of the powers of the municipality so far as concerns the Navigation Company; but if it may be considered as of any effect in the way of illustration or argument, it certainly tends to confirm the very reverse. It shows that the relations of the two corporations, so far from being left to implication, or to the discretion of the administrators of those bodies, were fixed by positive law; and, on examining the charters of several companies which have an operation within the limits of the city, the relations of the corporation of New Orleans with each, have been determined by positive enactment, and restricted by limitations, which constitute special delegations of power for distinct objects in which the citizens of New Orleans were supposed to have an interest.

LOUISIANA
STATE BANK
v.
ORLEANS NA-
VIGATION COM-
PANY.

To cite those cases which happen to be within our own recollection, we find the legislature uniform in the sense we have stated. In 1832, when the Commercial Bank was chartered for the object of securing a supply of water to the city, there is an express authority for the corporation of New Orleans to subscribe for a certain amount of stock. Laws of 1832, p. 160. In the charter of the Gas Bank, which was given for the purpose of lighting the city with gas, and in that of the Draining Company established for draining the swamps in the rear of the city, express provision is made to the same effect. Laws of 1835, pp. 70, 97. The rights of the city in the railways terminating within its limits are also expressly provided for, in the charters of these companies. Laws of 1835, pp. 8, 91. Charters of Nashville and Carrollton Railroad Companies. See also charter of Lake Borgne Navigation Company. Laws of 1837, p. 42. The only just inference from this legislation is that, the relations of the corporation of the city with companies operating within its limits, are established and regulated by express grants of powers, and it is not consistent with that legislation to infer them by implication.

Having these corporate parties before us we proceed to state the present case, which cannot be properly understood without keeping in view the distinct and substantive character of each.

The resolutions of the council of the municipality nominated in the bonds, and by virtue of which they were issued, authorized the mayor to endorse and guaranty, in the name of the municipality, bonds to the amount of $400,000, to be issued by the Navigation Company in such sums as the company may deem proper, and payable at certain terms from five to thirty-five years, bearing an interest at six per cent per annum. On the 21st of October, 1836, two hundred bonds of the Navigation Company of $500 each, were endorsed and guarantied under these resolutions, eighty of them were payable in 1861, and one hundred and twenty in 1866; they bore interest at six per cent, the interest being payable semi-annually. To secure the payment of the bonds by the company, and also the performance of its obligations assumed towards the municipality, a mortgage was given to the latter on all the real property of the company, its franchises, and privileges under its charter.

The object of the endorsements as disclosed by the resolution of the 29th of July, appears to have been the employment of the proceeds of the bonds of the company in the united interests of the company and the municipality, in advancing the commercial prosperity of the section of the municipality in which the basin and Canal Carondelet are located; and, as declared by the resolution of the 5th of August, the object was, the improving the navigation of the canal, and the making new works of

the same nature within the jurisdiction of the municipality. There are also, various other matters in the resolutions and contract between the municipality and the company which we have not stated, inasmuch as they do not affect materially the subject under consideration.

The validity of these ordinances, and the binding effect of the acts of the government of the municipality under them, are maintained by the counsel for the plaintiffs both as to their object and purpose, as well as the form in which the object is to be carried out and executed; the counsel for the municipality contending that the ordinances, both as to purpose and form, are void and of no effect, in consequence of the want of authority in the government of the municipality to enact them, and that the municipality is not bound by the acts of its officers under them.

In relation to the powers of political corporations, the provisions of our Code leave no room for doubt. That the powers of those charged with the local government of the internal divisions of the State are merely administrative, except in cases in which express authority is given by law, is a proposition which must command universal assent from those who understand our political system; that the same rule applies to cities and towns, *mutatis mutandis*, is equally self-evident.

Political corporations, says the Code, "are those which have principally for their object the *administration* of a portion of the State, and to whom a part of the powers of government is delegated *to that effect*." Art. 420. "The officers of corporations, by contracting, bind the corporations to which they belong in such things as do not exceed the limits of the *administration* which is entrusted to them; their act is supposed to be the act of the corporation." Art. 430. " It becomes necessary for every corporation to appoint some of its members to whom the direction and care of its affairs is to be entrusted, under the name of mayor, president, syndics, directors or others, according to the statutes and qualities of such corporation." Art. 429. " If the powers of the officers of corporations have not been expressly determined, they are regulated in the same manner as those of other agents." Art. 430.

The idea of an unlimited power on the part of the municipal agent over the property, capital and labor of the constituent, is repugnant to all sound principles of civil government, and has neither the authority of precedent or reason to support it. The trust exercised by him is, under our laws, a mandate in its simplest form, and its proper execution is within the reach of every citizen of ordinary information, under the direction of common sense and upright intentions. By far the greater portion of the self-government of this people is the practical working and result of this principle. The government of counties and towns of the different States constitute a material and most important part of our political organization, and the successful operation of the system shows how thoroughly it is understood, and that the unlearned as well as the learned, under a conscientious consideration of the public interests and within the limited circle of delegated powers, can ensure to those with whose affairs they are entrusted peace, order, and good government. The provisions of our own Code are so ample and so positive on these subjects, that it might be unnecessary to pursue our enquiries further; but in point of fact those provisions are the exponents of the law of corporations as it must exist in every well organized community under free institutions, and as it is understood throughout the Union.

The roman law considered communities whose interests were committed to

the charge of administrators, as entitled to the rights of minors. Mackeldey, Droit Romain, §143. Domat, lib. 2, tit. 3, sec. 3, §3, 4. Id. sec. 2, §5. Communities have a power of naming magistrates, directors and other administrators, who may represent the whole community, and whose resolutions may oblige them in such particular matters as these administrators are properly authorized to transact by their charter, or by the powers granted to them by the community. Erskines' Institutes of the Law of Scotland, book 1, tit. vii, §64, p. 191. The chief purpose of the institution (municipal corporations) is to regulate the internal affairs of the place. They are, by the common law, vested with the power of making ordinances or by-laws, for the government of all those who live there. Willcox on Municipal Corporations, p. 17.

A municipal corporation has, at common law, few powers beyond those of electing, governing and removing its members, and regulating its franchises and property. Id. §769. And where a statute invests a municipal body with powers contrary to the general rules of law, they must be granted in clear and unambiguous words; they will not be implied or presumed, and they must be exercised according to the strict interpretation of the grant. Id. §12, p. 26. *Kirk* v. *Norvill* and *Butler*, 1 D. and East, 124. In the case of *Dartmouth College* v. *Woodward*, the Supreme Court of the United States say: "A corporation being the creature of the law, possesses only the powers conferred on it by the charter creating it, either expressly or as incidental to its existence. These are such as were supposed by the legislative power to be best calculated to effect the object for which it was created." 4 Wheaton, 636. See also *Stetson* v. *Kempton*, 13 Mass. 272. *Bussey* v. *Gilmore*, 3d Greenleaf, 196.

It is contended in argument that the municipality has a substantive power to make canals throughout its limits, which was conferred by the 16th section of the act of 1805, which provides that it should be lawful for the mayor and city council "to cause common sewers, drains, *canals*, pavements, and bridges to be built and constructed in every part of the said city," &c. In that portion of Louisiana which forms the island of Orleans every plantation had its canals, and the use of the term in that section evidently indicates its object, and carries with it its just limitation. Its evident meaning is, canals for the purpose of draining. Any other interpretation cannot be reconciled with the plain acceptation of the whole sentence; and all doubt as to the intention of the legislator is removed by the grant of the right of making canals for purposes of navigation, made the same year, as we have seen, to the Navigation Company.

It is urged in argument that, the object intended to be attained by the endorsement of the bonds was a legitimate one and within the powers of the council of the municipality; that, for this object, having a right to expend the funds of the municipality *directly*, the council had an equal right to secure the same object *indirectly*, by assisting the navigation company in doing it: that instead of expending money it could lend its credit, particularly as security then considered ample was taken to indemnify the municipality against loss. It can hardly be maintained as a legal proposition that, for every act for which an agent may expend money for his principal, he can bind his principal in a contract of suretyship. The two things are so different, that it is difficult on legal principles to establish any thing like an approximation between them. The investment or expenditure of money, and the loaning of the credit of the principal under the law of mandate, are not governed by the same rules. The power of the agent as to the former may be implied and incidental, but in relation to the latter the power must be special, or necessarily implied from the

nature of the mandate. Why was security taken in this case? Because, by the very character of the contract and the nature of the business, the municipality would be exposed to loss, which there was a necessity for providing against. A recent work on this subject says : " Le mineur ou ses ayunts-cause pourront toujours demander l'annulation du cautionnement qu'il a consenti pendant sa minorité, car c'est un acte qui comporte lésion par sa nature même." Poncet, du Cautionnement. Suretyship is a contract which carries with it lesion by its very nature.

The open and direct appropriation and expenditure of money by the officers of a municipal corporation, has nothing in it in common with the contingent and long enduring contract of suretyship. One is a necessary function of administration, and we have not been furnished with any authority, of doctrine or precedent, to induce us to withhold our convictions that the other is not within its limits. Certainly there is nothing in this case which affords a reasonable pretext for engaging in such a contract, nor is stronger evidence required of the extreme danger and impolicy, to say nothing else, of the conduct of those in charge of the affairs of the municipality, in agreeing to loan the credit of the municipality to a company, for double the amount of its capital, which in most prosperous times and under a most advantageous charter, had already shown itself incompetent to attain the ends of its institution, and thus expose that credit to the contingencies of an administration over which they had virtually no control, and which the constituency and tax payer had no voice in appointing.

To say that this securityship is an act of administration in any sound legal sense, is an abuse of terms. Nor is it a necessary means of exercising any recognized power ; nor is it usual, for on this point we have no evidence, and it is the first time we have ever heard of a parallel act on the part of the government of a municipal corporation ; nor was it contracted in the proper course of the business of the corporation. The case is within none of the exceptions mentioned in the authorities quoted from Kent, and Angell and Ames on Corporations. Story on Agency, § 59 *et seq.*

But the question is not in this case, as to the power to bind the municipality by becoming a party to a promissory note. The plaintiffs are not in a situation in which they can stand on their rights as the holders of a promissory note without notice, but they are before us with no greater rights than the parties to the original contract had. The validity of the ordinances of July and August. 1836, under which the bonds were issued and to which they expressly refer, and not the power of the corporation to become a party endorser to the bond, is the test of this case.

Article 430 of the Code before cited, established a principle imperative in its application to acts of mandatories of corporations; they bind their principals only when they do not exceed the limits of their administration. There is no express authority given to the officers of municipal corporations to make the contract of suretyship, nor is there any general authority from which the power to enter into an engagement like this can be implied, or even fairly deduced, under the plea of usage, necessity, or convenience, or any reasonable compatibility with the public interests. Article 430 of the Code provides that, where the powers of the officers have not been expressly determined they are regulated in the same manner as those of other agents. The power to bind a principal to a contract like this, must be *express and special ;* these are the words of article 2966 applied to the authority of an agent to draw, or endorse,

bills of exchange or promissory notes. The ordinances therefore exceeded the power of those entrusted with the administration of the affairs of the municipality, for the bonds are nothing but promissory notes, to which the endorsement of the municipality was to give currency.

If, under our positive legislation, this act be considered as within the legitimate power of the government of a municipal corporation, it will be difficult to find an act which would be without it, and vain would be the restrictions and limitations which the law imposes on public servants, whose control over the property and labor of those who appoint them would be absolute and without bounds. We do not understand that the fortunes of the citizen are thus at the mercy of those who are accidentally in the possession of administrative authority, limited and ephemeral; nor that such a state of things can exist under our institutions under which office does not confer omnipotency, and the laws alone are supreme, and under their *ægis* minorities must always find protection from the arbitrary caprices of power.

Such being our conclusions as to the lawfulness of the means employed, let us examine whether the plaintiffs' claims are strengthened by the legitimacy of the objects to be effected by the resolutions as avowed and set forth therein. Taking the professed object of the contract to be, as cited in the printed argument of the counsel for the plaintiffs, for the benefit of the Navigation Company and the municipality, and in order to cause commerce to flourish in that part of the municipality in which the canal and basin are located, or to be the carrying into more extensive operation the objects provided for in the charter of the company, there are certain obvious objections to the exercise of the power which result from the exposition before given of the legislation concerning corporations, and particularly that which is relevant to the municipality and the city of New Orleans under its former limits: 1. No such power is given in any of the statutes concerning the city government. 2. The express and limited powers granted can be held, by no reasonable construction or inference, to imply any such power. 3. Nor can it be implied from the provisions of the Code concerning municipal corporations. 4. The legislature has fixed and established by law the relations which the municipal government is permitted to have with the several corporations operating within the territory of the city. 5. The legislature has, by special provision in the charter of the Navigation Company, determined the interest and relations of the city in respect to it. 6. It is not within any recognized power of municipal administration. 7. The selection of the *locale* in which commerce is to be caused to prosper by the loan of the credit of the corporation, is not within the legitimate functions of municipal administration; under our theory of self-government, that object is held to be best promoted by being left to the enterprize and competition of the citizens. 8. The argument by which the power is sought to be maintained proves too much: it would equally prove the right of the city council to bind the property of the constituency, by endorsing the bills of an individual. The commercial prosperity of a particular quarter of the city would be certainly, for a time, promoted, by the establishment therein of thrifty and enterprizing merchants and extensive warehouses; but can it be seriously contended that a municipal administration has, or ever had, the authority to loan its credit to favor that object.

The idea that the draining of the rear of the city was an object to be attained by the agreement with the Navigation Company, is evidently an after-

LOUISIANA
STATE BANK
*v.*
ORLEANS NA-
VIGATION COM-
PANY.

thought. As an argument it is suicidal, as it repels the avowed purpose of the ordinances—the improvement of the navigation of the canal and bayou St. John.

It is said that the legislature considered that the municipalities had the power to become accommodation endorsers, and this is inferred from the act of 1839. It is unnecessary to comment on this act, as it provided that the loans or emission of bonds of the municipalities, now authorized by ordinances or resolutions, shall not be affected by any of the provisions contained in it. Act of 1839, p. 96. Nothing can be clearer than that it was the recorded intention of the legislature, to leave the subjects of the proviso untouched, and resting on their validity and binding force alone. The cases referred to of *The Municipality* v. *The Theatre Company* and *McDonogh* contain nothing which conflicts with any portion of this opinion; on the contrary, we consider the general reasoning of the court in both cases to be in affirmance of it.

In a suit instituted by the bank against the municipality on a number of dividend warrants which fell due before those now sued on, but which were appended to the identical bonds discounted by the bank, a judgment was rendered in favor of the plaintiffs for the sum of $3,400, which was signed on the 5th of March, 1840. Under this judgment, and for that amount, and for other arrears of interest which it afterwards paid on the bonds, the municipality caused to be seized and sold the property mortgaged, and became the purchaser. The sale produced a larger sum than was due to the municipality. This judgment, and the satisfaction of it by the defendants, is charged in the petition, and is held in the argument of counsel, as repelling or precluding the defence set up in this suit. If this judgment has any effect in this suit it must be as *res judicata*. The enquiry is, therefore, whether the thing demanded is the same in both suits, and whether they are founded on the same cause of action. The first suit was for interest, and the present suit is for interest subsequently falling due on the same obligations. The series of bonds held by the plaintiffs was not payable until twenty-five and thirty years after date, and the interest of six per cent was payable semi-annually. The bonds, as we have seen, were of $500 each, and the dividend warrants were, in the margin, numbered, and for $15 each, and in such a form as to be separated from the bond without injury to it, and bearing the signature of the officers of the Navigation Company, who signed the bond. It is obvious then in this contract, or rather in each bond, that the interest was not merely an accessory to the principal debt but a substantive part of it, and constituted a main portion of the value of the bond itself, as well as a principal inducement of its purchase by the plaintiffs.

The text of the roman law, Si in judicio actum sit, usuræque solæ petitæ sint, non verendum ne noceat rei judicatæ exceptio. L. 25, ff. de Excep. Rei Judicatæ, is founded upon the fact that it by no means follows that, because the interest is not due the capital is not due. The contract for interest has often conditions, independent of the original contract. It may not have been stipulated, nor at the rate sued for, it may have been paid, been remitted, or prescribed; and it is clear that, as a general rule, a judgment in a suit for interest, particularly when evidenced by a distinct obligation, is not *res judicata*. But if, in a suit for interest, the validity of the original contract itself is adjudicated upon, or in a suit on a portion of a contract which the parties may have divided, on the principles laid down in the case of *Morton* v. *Packwood*, *ante* p. 167, we should incline to the opinion that the judgment in such cases

would be conclusive between the same parties. We understand such to be the jurisprudence of the civil law.

To constitute the thing adjudged according to the roman jurisconsults in material things, *idem corpus, quantitas eadem,* were required, and in incorporeal things, *idem jus.* And the requisite for the *res judicata, ut sit eadem res,* was not taken in its literal meaning, but was understood in its more enlarged sense, on principles of public convenience. Pothier on Obligations, part 4, ch. 3, § 3, art. 4, no. 44. Duranton, vol. 13, nos. 464, 469. Pothier. vol. 10, § 144. Accordingly a judgment on one year's arrearages of a *rente* was held to be conclusive as to arrearages of subsequent years, when the case had been decided on the validity of the contract. Journal due Palais, vol. 2, p. 246, year 1843. In the case of Thevenin and Julien, the Court of Cassation held, that in an action on a part of a debt, which was payable in portions of one-fourth, a judgment on the first fourth was conclusive as to the balance of the debt—the nullity of the obligation having been pleaded. Dalloz, 31, 1, 25. Sirey, 31, 1, 41. But where a case goes off on some matter of form, or some technical defect, it is obvious that the fact itself negatives the idea that the causes of action or defence were the same, or that the adjudication was had on the contract; and a case so terminated does not in any sense form *res judicata* in another suit, in which the original cause of action is in controversy. *Hughes v. Blake,* 1 Mason, 515.

In the case in which the judgment pleaded was rendered, the same question was raised and argued by counsel, but the judge, though he evidently considered the law to be with the defendants, and gave his intimation strongly to that effect, in his written opinion, did not feel himself authorized to give the municipality the benefit of it, because the matter of defence was not specially pleaded, and condemned the defendants. From this judgment no appeal was taken, and this defence never was adjudicated upon.

If we found that this judgment was under our jurisprudence *res judicata,* we should have held the defendants to it with all its consequences. The law in this respect makes no distinction between corporations and natural persons. The minor himself when represented is equally bound by the authority of the thing adjudged, the sanction of which is founded in the safety of society itself. Status reipublicæ maxime judicatis rebus continetur. Cicero pro Sylla. But we do not consider the judgment as forming *res judicata,* nor that the municipality is precluded from making this defence by having satisfied it, nor by the acts of their agents, which the counsel consider as an estoppel. All arguments by which this view of the subject is supported have for their foundation the doctrine of ratification, as existing between principal and agent.

On all other questions presented by this case, we have, from the beginning, been unanimous. But on that, whether the doctrine of ratification is applicable to a case like this, we have long differed. Deeming this case a hard one upon the plaintiffs, we have all felt anxious to give effect to their claim; but we have been unable to find any authority that sustains it, and we have reluctantly come to the conclusion that, as this contract has never inured to the benefit of the corporation, it could not have been ratified, either expressly or tacitly, and the political body cannot be made responsible for it.

As stated by the court in the case of *Egerton v. Municipality No. Three,* 1 Ann. R. 435, the city of New Orleans is made by the constitution of the State one of the permanent functionaries of government; and the laws by which it

is organized are eminently laws for the preservation of public order. from the force and obligation of which individuals cannot derogate by their conventions. C. C. art. 11. It is the main characteristic of laws of that description that, contracts made in violation of them are absolute nullities, not susceptible of ratification. Laws for the preservation of public order, says Dunod, resist perpetually and by themselves to the contracts they prohibit, and reduce them to naked facts, which can be neither confirmed nor authorized, and from which accrues no right, no action, no exception. 7 Toullier, no. 553. 8 Toullier, no. 515. Dunod, Prescription, part 1, ch. 8, p. 47.

If by the acts of the municipality an obligation has been created on its part towards the Navigation Company *ex æquo et bono*, the plaintiffs, as creditors of the company, may indirectly have the benefit of it; but to what extent we have not the means before us of determining. We can only decide that they do not establish a right in the plaintiffs to recover in this case.

In conclusion, we consider that the municipal authority, in passing the ordinances before us, transcended the powers vested by law in the council; that, even admitting the object of them, to wit, the improvement of the *navigation* of the bayou and canal to have been a legitimate one, the means adopted to effect it were unlawful, unnecessary, not sanctioned by usage, nor justified by any reasonable interpretation of powers of administration; that in fact and in law the object itself was not within the administrative powers vested in the corporation, and that the acts herein examined have created no debt obligatory on the municipality. This is the only act of the kind on the part of those entrusted with municipal government, which, to our knowledge, has ever been presented to a court of justice. It has no precedent to palliate it, and in adhering to those land marks which the law has established for the direction of those entrusted with power over the property of the citizen, we see no danger and no injury to any one—nothing but justice for the past, and security for the future.

The functions of the different branches of our State governments under their constitutions have been settled in the different States, and a jurisprudence has been formed in relation to them which must be considered as the settled law of the land. In reference to this system we must examine and construe the charters of our corporations, and all grants involving municipal or corporate powers. *Atchafalaya Bank* v. *Dawson*, 13 La. 497. A corporation, being the creature of the law, possesses only those powers which the charter of its creation confers upon it, either expressly or as incidental to its very existence. That corporations created by statute must depend for their powers and the mode of exercising them upon the true construction of the *statute*, may be considered as an established rule of jurisprudence, settled by the highest authority and recognized by our own Code. *Runyan* v. *Lessee of Coster et al.*, 14 Peters, 129. *Bank of Augusta* v. *Earle*, 13 Id. 584.

Our duty is to follow it, and to impress on all those entrusted with municipal authority, the necessity of confining their action within its just, lawful and well defined limits—the best means of promoting the welfare and prosperity of the constituency, as far as their powers or responsibility is concerned.

In this case it must be borne in mind that we are *adjudicating* on the rights of the original parties to this transaction as they are presented in the record, without reference to any other interests than those we are called upon to decide.

The judgment of the District Court is therefore reversed, and judgment rendered in favor of the defendants, with costs in both courts.