finally agreed, and the verdict was received by the court and ordered recorded and the jury discharged.

In the Fuselier Case, 51 La. Ann. 1317, 26 South. 264, this court held that the discharge of a jury for disagreement is a matter in the discretion of the trial judge and not ordinarily subject to review. The detention of a jury for a few hours longer cannot be considered as coercion.

It is settled beyond controversy that the receiving and recordation of a verdict on a Sunday or other dies non juridicus is permissible. See State v. Atkinson, 104 La. Ann. 570, 29 South. 279, and authorities there cited.

There was no bill of exception taken to the overruling of the defendant's motion for a new trial, and therefore the action of the judge in overruling the motion cannot be reviewed quoad matters not embraced in the bills of exception, or patent on the face of the record, such as the charge that a letter dehors the evidence was improperly read by the district attorney to the jury in the course of argument.

After a careful consideration of all the bills of exception discussed in the briefs of counsel for the accused, and a review of the entire record of the case, we are satisfied that the defendant has had a fair trial according to the laws of the land.

It is therefore ordered that the verdict and sentence below be affirmed.

(52 South. 1010.)

No. 17,701.

In re PLEASANT HILL LUMBER CO., Limited.

(Jan. 17, 1910. Rehearing Denied June 6, 1910.)

(Syllabus by the Court.)

1. LOGS AND LOGGING (§ 26*) — LABORERS' PRIVILEGES.

The Pleasant Hill Lumber Company went into the hands of a receiver, A. B. Ives, who sold to the Pleasant Hill Lumber Company for $100,750.61 the lumber plant, including the lumber in stock, for which he received $29,000 cash, the assumption by the company of a debt of his, and notes secured by a mortgage and vendor's privilege. However, he waived the vendor's lien on 1,550,000 feet of lumber.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 60–66; Dec. Dig. § 26.*]

2. LOGS AND LOGGING (§ 26*) — LABORERS' PRIVILEGES.

The receiver entered into a contract with the laborers, by which he agreed to furnish them with supplies as part of their wages, and the balance to be paid when the company was more prosperous. These laborers have a privilege on the lumber in the mill in which they have worked for the payment of their wages, which privilege subsists for 30 days after the maturity of the debt. Act No. 145 of 1888.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 60–66; Dec. Dig. § 26.*]

3. RECEIVERS (§ 162*)—LABORERS' PRIVILEGES.

One who has worked for a receivership as a bookkeeper and clerk is entitled to a privilege for the payment of the amount due him, and this privilege is to be ranked as provided by paragraph 5, art. 3252, Civ. Code. If the movable property not subject to any privilege is sufficient to pay him he should be paid therefrom, and, if not, then in the order mentioned in the Code. If this is not sufficient, then the balance must be raised on the immovables of the debtor. Civ. Code, art. 3266.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 162.*]

4. PLEDGES (§ 11*)—ACTS CONSTITUTING.

The Pleasant Hill Lumber Company borrowed from the McCullough-Weaver Lumber Company $17,000 for which they pledged all the lumber they had on hand and all the lumber that would be manufactured by them from April 1, 1907, to April 1, 1908, the pledge of this stock to go into effect as soon as the lumber was cut, and the contract declared that the lumber had been delivered. At the same time the Pleasant Hill Lumber Company leased to the McCullough-Weaver Lumber Company their yards, shed, and kiln, but the lessee never went into possession. This did not constitute a pledge of the lumber, effective as against third persons. Pledge is grounded on possession, and the creditor, in order to have a pledge must remain in possession, and the property pledged must pass from the hands of the owner to those of the pledgee, and there must also be a complete separation of the property pledged from the other property of the pledgor. Possession is of the essence of pledge, and a mere agreement by the pledgor to let the pledgee have possession of the property pledged, without such actual possession, will not constitute a pledge as against third parties.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 28–35; Dec. Dig. § 11.*]

5. PLEDGES (§ 5*)—ACTS CONSTITUTING.

The property to be pledged must exist at the time of the pledge, otherwise there cannot be the possession that is essential to the pledge. While the logs from which the lumber comes may be pledged, still pledging the lumber does not operate as a pledge of the logs.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 14, 15; Dec. Dig. § 5.*]

6. RECEIVERS (§ 81*)—NATURE OF POSITION.

A receiver represents both the creditors and their debtor, the insolvent corporation. He is the trustee of both and bound to serve both. High on Receivers, p. 22. His right to represent the creditors in opposing a contract entered into by the debtor is generally limited to questions of fraud, but he may be heard individually when he asserts a personal right, although precluded from being heard as a receiver.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 150; Dec. Dig. § 81.*]

7. RECEIVERS (§ 154*)—LIABILITY FOR ATTORNEY'S FEES—PRIORITIES.

The services of the attorney for the receiver were rendered for the benefit of all parties in interest, and each should pay, as far as ascertainable, to the extent of his interest. As the debts of a receivership are of a higher dignity than those of the insolvent they are to be paid before those of the latter.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 279–282; Dec. Dig. § 154.*]

8. RECEIVERS (§ 200*)—LIABILITY FOR FEES.

The commissions of a receiver like those of an attorney must be prorated among the several interests.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 397–401; Dec. Dig. § 200.*]

9. RECEIVERS (§ 202*) — ACCOUNTING — PROCEEDINGS AND REVIEW.

Where it is urged that the receiver should be charged with the inventoried value of the property of the receivership, sold to him through an interposed person, the plea must be pleaded in the court a quo, and cannot be urged before this court in argument. Where the fact is ascertained only on the trial, the pleadings should then be amended.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 202.*]

10. RECEIVERS (§ 93*)—LIABILITY FOR EXPENSES OF OPERATION.

Where repairs are necessary to operate a planing mill and these repairs are made by the receiver, they are not chargeable to the permanent improvements, for it was to the interest of the creditors to operate the mill, but they must be charged to materials. Neither is the cost of keeping live stock used in hauling lumber to and from the mill chargeable to the immovable property.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 171; Dec. Dig. § 93.*]

11. LOGS AND LOGGING (§ 26*)—LABORERS' PRIVILEGE—EXTENT OF RIGHT.

One who furnishes money, or supplies, or labor to "deaden, cut, haul, float, or raft any logs, or forest timber" has a privilege on the logs or timber under Act No. 33 of 1882, but this privilege does not extend to the lumber cut from them. The Legislature confined the privilege to logs, and as privileges are stricti juris, the court cannot extend the privilege to lumber.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. §§ 60–66; Dec. Dig. § 26.*]

12. CORPORATIONS (§ 566*)—RECEIVERSHIP—RIGHT OF PRESIDENT AS CREDITOR.

The president of an insolvent corporation, who is also a stockholder and who acts in good faith, is entitled to stand with other creditors when he claims only as an ordinary creditor.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2283–2286; Dec. Dig. § 566.*]

13. RECEIVERS (§ 153*)—RECEIVERSHIP—LIABILITY FOR TAXES.

Taxes should be apportioned between the movables and immovables, but the realty will not be charged with insurance premiums on the lumber. The privilege for taxes on the realty is superior to the vendor's mortgage and privilege, but the claim for insurance premiums is not superior to these.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 153.*]

Appeal from Twelfth Judicial District Court, Parish of Sabine; Don E. So Relle, Judge.

In the matter of the receivership of the Pleasant Hill Lumber Company, Limited. To the account of the receiver, the McCullough-Weaver Lumber Company objected, and appealed from the judgment allowing and disallowing certain claims in the account. Account homologated with amendments.

Pugh, Thigpen & Herold, for appellants receiver and A. B. Ives. Hall & Jack, for appellants McCullough-Weaver Lumber Co., Ltd. C. W. Elam and R. A. Fraser, for appellants Earl H. Browne, J. J. Browne & Sons, D. A. Walker, and others. Lee & Pegues and C. W. Elam, for appellants Hardee, Gaddis & Co. and Brown-Timmons & Co.

BREAUX, C. J. The Pleasant Hill Lumber Company, in the autumn of 1907, owing

to the financial depression, was embarrassed financially.

The company offered to continue its operations provided the mill hands consented to receive for their labor such provisions as the company might advance through merchants in the town of Pleasant Hill and the balance of their wages later when business brightened.

The employés consented.

The mill was operated from October of that year until March of the year succeeding.

In March the manager notified the hands and other employés that the company would not be able to pay them.

Those whose claims amounted to less than $100 filed suit in the magistrate's court, and those whose claims amounted to over that sum filed suit in the district court. Each claimed a privilege on the lumber manufactured during the period of his employment.

In some of the suits, sequestration issued and lumber on the yard was seized.

Shortly after these suits had been filed, on application of A. B. Ives, a creditor, the court appointed him receiver of the Pleasant Hill Lumber Company. He went into possession. The creditors who had brought suit did not seek to go further with their suits.

The creditors, those last above referred to, and others entered into an agreement with the receiver to enable the receiver to sell the lumber at private sale and at the same time in order to reserve the rights of all concerned in the proceeds of the sale.

In the agreement it was stipulated that separate accounts of the sales would be kept of the old lumber not subject to the privilege of these laborers and employés and of the new lumber subject to the privilege.

Originally, A. B. Ives, the receiver, became a creditor of the Pleasant Hill Lumber Company by selling to the company the lumber plant, including the lumber in stock, to the Pleasant Hill Lumber Company for $101,-752.61, $29,000 of the amount cash, and the balance by assuming a debt of the vendor, Ives, and by executing notes for the balance over this debt.

Ives, the vendor, retained a mortgage and vendor's privilege on the property, but waived the vendor's lien on 1,550,000 feet of the lumber sold.

The Pleasant Hill Lumber Company, vendee, on the day it purchased from Ives, borrowed $17,000 from the McCullough-Weaver Lumber Company, which the Pleasant Hill Lumber Company, purchaser, used in making its cash payment. To secure that amount, the Pleasant Hill Lumber Company pledged to McCullough-Weaver Lumber Company their stock, consisting of 1,700,000 feet in their mill yard and in their sheds and kiln at the time. The written pledge contained the declaration that the Pleasant Hill Lumber Company had delivered all this property to the McCullough-Weaver Lumber Company in pledge.

The first-named company also pledged all the lumber which they would cut at the mill from April 1, 1907, to April 1, 1908, the pledge of this stock to go into effect as fast as it could be delivered to the McCullough-Weaver Lumber Company.

The stock was insured by the Pleasant Hill Lumber Company for the benefit of their creditors just named.

On the day that this contract of pledge was signed, the Pleasant Hill Lumber Company leased to the McCullough-Weaver Lumber Company their lumber yards and kiln, for a period of one year from March 30, 1907, to April 1, 1908, for a monthly rental of $2.

On the same day that the contract was signed, the Pleasant Hill Lumber Company entered into another contract with the McCullough-Weaver Lumber Company, in which the former agreed to intrust the McCullough-

Weaver Lumber Company with the sale of all its lumber products for one year from April 1, 1907.

All these contracts were recorded.

The price agreed upon between these two companies was $1 less than the price which McCullough-Weaver Lumber Company would obtain for it, and the latter company bound itself to pay cash 2 per cent. on the lumber as fast as shipped from the Pleasant Hill Lumber Company yards.

It was further stipulated that if the stock of lumber on hand on the first of the month was greater than the amount on hand at the date of the contract then McCullough-Weaver Lumber Company would advance $10 for every 1,000 feet above the 1,700,000 feet it acquired of the Pleasant Hill Lumber Company, and if the amount were reduced below the 1,700,000 feet then the McCullough-Weaver Lumber Company would reduce its advances $10 for every 1,000 feet of stock less than the 1,700,000 feet.

The Pleasant Hill Lumber Company bound itself to comply with the requirements of the McCullough-Weaver Lumber Company in matter of shipment, and also in regard to grading.

The insistence of the McCullough-Weaver Lumber Company is that they were in actual possession—did all that was required in order to go into actual possession—of all the stock pledged to them. The pledgees, the McCullough-Weaver Lumber Company, urge that which is correct, that the receiver had agreed with them and the laborers of the Pleasant Hill Lumber Company to see to the dressing and shipping of the lumber, dispose of it, and that he bound himself to keep a separate account of the lumber on hand, as before stated; that is, the new and the old lumber were to be kept separate.

This the receiver failed to do.

The property of the Pleasant Hill Lumber Company was adjudicated to the son of the receiver.

The receiver as a witness admitted that his son was not the real purchaser; that he was the real purchaser, and that his son was only a party interposed.

The receiver filed an account of gestion, in which he placed the price of the real estate to the credit of his mortgage and vendor's note which he held and had continued holding since the sale mentioned. He also credited himself with a commission of $2,950 as due him as receiver. He allowed $3,500 to his attorney.

Each, the commission and attorney's fee, was mentioned as secured by privilege.

The lumber sold by him in accordance with the agreement before mentioned netted $8,341.28.

He placed the claim of McCullough-Weaver Lumber Company on the account for $17,357.30 not secured by pledge or privilege.

McCullough-Weaver Lumber Company opposed the account on the ground that they had a pledge on all lumber; that a list was made on the 2d of January, 1908, showing 1,453,595 feet actually in their possession, as they contend.

They ask an amendment of the account recognizing them as having a pledge upon the price of the lumber, free from any expenses or costs of administration except the cost of dressing and preserving the lumber. Their contention is that it was in the agreement, heretofore referred to, that all parties should remain absolutely unaffected by the sale in the receivership, and that they would not be subject to any expense, fees, or commissions of the receivership. Further, these opponents set out that inasmuch as the receiver failed to keep separate the old and the new lumber he should be charged with the old lumber at the average price obtained by him for the lumber sold during his administration, to wit, 587,587 feet at $8 a thousand.

These opponents further opposed the receiver's commission, to wit, $2,950, and urged

that it should be reduced from 5 per cent. to 3 per cent., if not entirely rejected, as the amount for distribution exceeds $50,000.

The opponents questioned the receiver's right to traveling expenses and feed bills for mules, and the further contention was that an item of $326.86 should be charged to the price of the real estate as they were repairs of a permanent nature.

Opponents complained of an item of $2,-221.80 (pay roll) as excessive; at any rate, there should be deducted from it whatever was spent for permanent improvements. They aver that the expenses for night watchman, $372 plus $102.70 should be apportioned between the price of the real estate and the other property as they inured equally to both; that from the $2,221.80 there should be deducted $330 for a transit dressing machine; that the insurance premiums paid on the lumber should be divided between the old and the new lumber; also the taxes.

There are other grounds. We pass them without further reference to them at this time.

At bar and in brief these opponents called attention to the difference between the inventory value of the property, to wit, $73,-600 (inventory made after the receiver went into possession) and the price paid by the receiver at the sale of $54,000, to wit, $19,600, and in this connection urged that the receiver, having bought the property through the interposition of his son, should be held liable to account for the difference between the inventory value and the price at which it was adjudicated to the son for him the receiver even in the absence of attack in the pleadings upon the sale for nullity.

It is in place to state here that the admission of the receiver was forced from him over his objection.

The opponents also urge that if the court should allow the claim of the president of the late company it should not be paid until all the other creditors are paid, as it is not right or equitable that the stockholders in the enterprise be paid concurrently with the creditors.

The judge of the district court did not allow the pledge claimed by the McCullough-Weaver Lumber Company, but recognized the claim and privilege of D. A. Walker and other employés, mechanics, and laborers, also the claim of E. H. Brown, bookkeeper, with privilege. He reduced the fee of attorney from $3,500 to $2,700, and the receiver's fees from $2,900.50 to $2,620. He rejected certain other claims for small amounts. The district court ordered the privilege recognized to be paid out of the proceeds of the sale of the lumber sold by the receiver, and if that amount proved insufficient then to be paid by the receiver individually.

McCullough-Weaver Lumber Company, opponents, have appealed.

A. B. Ives, receiver of the Pleasant Hill Lumber Company and individually, also appealed.

### Claims of the Laborers.

The receiver in his account classed these laborers' claims under the head of ordinary.

They (the laborers) ask that the judgment of the district court recognizing their privileges before stated, be maintained in so far as they are concerned.

With reference to laborers, the law provides that they have a privilege on the lumber in the sawmill or planing mill in which they have worked for the payment of their wages for 30 days after the maturity of the debt. Act No. 145 of 1888.

In their opposition in the district court they ask for a judgment for the amount and privilege and personally against Ives, the receiver, in case the court found that the receiver had violated his agreement and had not kept the proceeds of the sale of the lumber upon which they had asserted a privilege.

The facts are, in regard to this claim of the laborers, that they offered in evidence the pay roll, which shows that amount due them for labor less the goods received by them as had been agreed upon, as before stated.

The mill was embarrassed financially; as before stated the laborers were notified by the manager that he did not think he could meet the October pay roll but that he would pay as soon as possible; that the company had claims out, and if they wanted to continue working he had contracted with merchants at Pleasant Hill to furnish the necessaries of life in order that they might continue with their work and operate the mill. As to the balance that would be due them, he could not state when it would be paid in cash.

They all went to work under the agreement, with the understanding that they would be paid as soon as the mill would recover from the effect of the financial panic which was then prevailing.

At the time that this agreement was entered into they had not earned the wages claimed by them in this litigation. They continued to work until they were notified that they should protect themselves as the company could not pay them.

It will not be presumed that the laborers in entering into this agreement intended to waive their rights and to work for nothing over and above the necessaries of life. The intention seems to have been to the contrary. Now, as to the term of payment agreed upon in regard to which the receiver contends, it was too indefinite to be considered a stipulated time of payment.

Payment for work to be performed may be conditioned upon an event to happen.

In answer to the statement which counsel submit in the argument, by way of illustration, that if the laborers had brought suit immediately after the first month for their work and before the return of the expected normal condition of business, at which time the employer bound himself to pay, the employer would not have been heard to urge prematurity.

We can only say (however) that that may be; as relates to laborers, they should never be made to lose their hard earnings unless entirely unavoidable. Those who have more time to see to the protection of their rights than these laborers should be held strictly. Not so as to the mere toiler. He should, if reasonably possible, be paid.

A worthy feeling generally prompts the employer to see that those who have toiled in his employ be paid at the earliest opportunity. The agreement was legal and binding. It was entered into in good faith. It would be different if there was the least want of sincerity about it and it had been inspired by a desire of circumventing the statute.

### E. H. Brown, Clerk.

This creditor claims a privilege. He was bookkeeper of the company, and attended to other duties such as are attended to by clerks. He has a privilege for the payment of amount due to be ranked as provided by Civ. Code, art. 3252, par. 5.

The question as to his right has been argued, and contention urged, that he should be relegated in the end to the sale of the immovable property for payment.

We will state to the contrary if the movable property not subject to any special privilege is sufficient to pay the debt it should be paid from that class of property, and, if not sufficient, then in the order mentioned in the Code, and then, if this is not sufficient, "balance must be raised on the immovable of the debtor" as hereafter provided. Civ. Code, art. 3266.

### The Claim of McCullough-Weaver Lumber Company.

The act of pledge under which they claim is dated March 30, 1907. The evidence does

not prove that they have gone into possession. It is not denied that to constitute a valid pledge there must be actual delivery to the pledgee. Their contention is that there was delivery and that they were in possession until the property was sold in accordance with the agreement, which protected their right as pledgees. The right is not apparent.

We have noted in the statement of the case that a lease was signed at the time that the act of pledge was passed. It was only recorded after the creditors had about acquired all the rights which they claimed. The rental per month in this lease was $2. Although small, it was never paid. As a part of a scheme to the end of securing a pledge, it had no reality. Evidently it was never the intention of the lessee to take charge of the property leased.

It follows that the opponents' pledge must be considered as if no attempt had ever been made to write a lease.

Now, as relates to the pledge—without reference to said illegal lease—we will state that possession is a fact, and the pledge effective against third persons is grounded upon possession.

It was agreed between opponents and their debtor, the Pleasant Hill Lumber Company, that as the lumber came from the mill it would become burdened with the pledge.

It was the intention that the moment that the trees were converted into lumber they belonged to the owners of the mill. It was thereafter placed in the hands of the owners who held it in accordance with their agreement to pay their advances, as opponents contend. They, these opponents, were given a part of the proceeds and retained a fractional portion themselves. As the lumber was sold, other lumber was received by the opponents. It was proposed to make the pledge serve as a kind of blanket pledge, to use a word familiar to insurance people.

This cannot be done under the article of the Code.

The logs from which the lumber was sawed could have been pledged, but pledging the lumber did not have the effect of pledging the logs. Possession is essential. Civ. Code, art. 3152.

The creditor in order to have a pledge must remain in possession. Civ. Code, art. 3162.

The property pledged must pass from the hands of the owner to those of the pledgee. The separation between other property of the debtor and the property he has pledged must be complete.

The decision in Casey v. Cavaroc, 96 U. S. 483, 24 L. Ed. 779, was well considered, and is pertinent to the issues in the pending case. It reviews Louisiana jurisprudence to the date it was rendered and decides, as has frequently been decided by this court, that possession is of the essence in matter of pledge.

It may, for instance, be given by delivering the keys of the building in which the property pledged is stored, but this pledge, by delivering the keys, would amount to very little against third persons if, after the delivery of the keys the owner of the property pledged, were to exercise rights over it or retain its control.

In the pending case for decision, it does not appear that any of the lumber was ever placed in the control of the creditor in the manner and to the extent required in pledging property.

The act does not cover any part of the property for the reason we have before stated. Bank v. Janin, 46 La. Ann. 995, 15 South. 471; Succession of Lanaux, 46 La. Ann. 1036, 15 South. 708, 25 L. R. A. 577; Donoven & Daley v. Travers & Hermann, 122 La. 462, 47 South. 769.

We have read the extracts from well-known commentators cited in the brief of learned

counsel for the opponents. They seem at first blush favorable to an easy and convenient method of pledging property—perhaps advisable. With the advisability of the method we have naught to do. Our law seems plain as relates to the necessity of possession, and the interpretation heretofore given is, to our thinking, conclusive.

These commentators, referred to above, it must be said, do not go to the extent of expressing the opinion that a merchant who advances to a manufacturer can have himself recognized as pledgee against third persons by entering into a contract which does not give him control of the property pledged.

If the creditor had taken control under the lease, and had exercised his right as pledgee it would be different.

No contract can be legally maintained as a valid pledge when there is very great doubt as to whether it is to be considered a pledge or a contract with a customer to induce him to consign the products of his plant to the merchant to be sold for his account.

The contention of the opponents is that the receiver stands in the shoes of the insolvent corporation, and that he cannot attack the acts of the corporation.

The better doctrine is that the receiver represents the creditors and their debtor, the insolvent corporation. It is said that he is trustee for both, and that he is bound to serve the interest of each. High on Receivers, p. 22.

There is a limit to the extent that he can represent the creditors in opposing a contract entered into by the debtor. It is generally limited to questions of fraud.

The question would be discussed further, and we would seek to establish wherein the receiver may or may not in this instance question the acts of the insolvent corporation; but we are relieved from the necessity of that investigation. The receiver presented his own account to the court. He has placed himself on that account as a creditor secured by mortgage and vendor's privilege in a large amount. From a judgment, which he must have deemed in some respects adverse to his interests, he has taken an appeal to this court individually. He is before us asserting a right personal to himself. He must be heard in his own behalf even if he cannot be heard as a receiver.

### Fee of Attorneys.

The opponents do not complain of the amount for fee of attorneys; their contention is that the services were rendered at the request and for the exclusive benefit of the receiver.

The fact is that these services were rendered for the benefit of all parties in interest.

The interested parties should pay as far as ascertainable to the extent of their respective interest.

This was the gist of the decision in Succession of Whitehead, 3 La. Ann. 397.

The debts of a succession were considered of a higher dignity than those of the deceased; also the debts of the receiver to those of the insolvent, and they are to be paid before those of the deceased or the insolvent. Friend v. Graham's Adm'r, 10 La. 439.

To the same effect was the case of Succession of P. O. Lauve, 18 La. Ann. 722; that decision went far in applying article 3267 of the Civil Code to an attorney's fee as not being chargeable to the movable property.

We are not inclined to criticise the decisions of our predecessors or to overrule them, but as to this point, we must say that it is error.

In Succession of Gale, 21 La. Ann. 487, the administratrix proposed to pay the general privilege by preference over the proceeds of the movable.

The court held that this would be an injury to the creditors who had a special privilege on the movable.

The court applied article 3267 so as to secure both those who had a special and those who had a general privilege, by charging movable and immovable in proportion to each.

In Succession of Wells, 24 La. Ann. 163, the court followed the Friend Case, and held that they must be paid by preference.

In these decisions the question did not present itself of the entire exclusion from all participation in the proceeds of creditors who had a special privilege.

Originally the French Code was taken as the basis of our articles on the subject of privilege.

They have been very much amended since. Only a few articles remain unchanged or unamended.

None the less, the general plan is the same.

Laurents, No. 523, vol. 29, refers to law charges to be distributed according to benefit received.

In the case before us each should pay $2,700; the interest of $54,000 to pay $2,304.-68, and the interest of $9,262 the balance of $395.32, to be ranked as law charges and with preference for payment of last sum of $395.22, over all sums or claims on the movable property.

### Receiver's Commission.

The receiver held a large claim secured by mortgage against the insolvent. True, it did not disqualify him from acting as receiver. It rendered it necessary, however, for him to be very careful in managing the property.

We have noted that an agreement was entered into between the receiver and the creditors. It should have been kept by the receiver. He should have separated and have kept separate the lumber, as was agreed upon, and the proceeds of the lumber after its sale.

Again, in operating the planing mill, there is evidence showing that the management was not economical.

We are not of the opinion that (in view of the issues raised before the district court, as presented before this court) he should be denied all commission.

The commission of the receiver must be prorated as above in matter of the fee of attorney; that is, $2,600 is to the sum before mentioned.

In the case each should pay $2,600; the first above-named interest should pay $2,-220.91, and the other $379.09, the latter to be paid by preference over the movable property.

### The Sale of the Mill.

The charge in argument by learned counsel for opponents was that the property was bought through a person interposed. The account was not opposed on that ground. The receiver, on cross-examination, in substance, stated that his son was an interposed party.

Objection was urged to the admissibility of his testimony.

In argument the attorney for the opponents urged that the receiver should be charged with the amount at which the property was appraised in the inventory of the insolvent instead of the amount at which the property was adjudicated to his son for his benefit.

That issue was not pleaded. The reason given for not pleading it is that the opponents did not know that the receiver had bought for himself before he testified on cross-examination.

It remains, even at that late stage in the case, the offer to amend would have been in time. It would have been in time even on the rehearing. But in argument before this court such an issue comes too late. It cannot be entertained.

Opponents cite as authority, for amending the account at this time on an issue not raised, as this opponent contends the case of Sheets Lumber Company, 52 La. Ann. 1337,

27 South. 809, and urge that the precise point in that case was not made in opposition, but only in the brief and in argument in the Supreme Court.

We recall the facts in the just-cited case. There was a general opposition filed; fraud was charged, and, as we recall, the sale was attacked on different grounds.

The cases are not similar.

### Repairs.

Objection was made by the opponents to the account in so far as the receiver charges for repairs made in the planing mill. The ground is that they are permanent improvements made to the planing mill and should be charged to the proceeds of the sale of the mill, diminishing by that much the amount realized by the receiver on his individual claim as a creditor with a mortgage.

The sawmill was not operated after the receiver qualified; but he did operate the planing mill in order to dress lumber for the market after having obtained an order from the court authorizing him to run this planer.

It became necessary to make some repairs in order to enable the receiver to carry out the order of the court and run this planer.

These repairs are not chargeable to permanent improvements. It was to the interest of the creditors to run this planing mill. Some profit we infer was realized therefrom by the receiver. The small amount required for its operation must be charged to the material worked in the planer.

If we were to attempt to deduct the amount from the item in question, as suggested by counsel for opponents, for permanent improvements, it would be a matter of impossibility to fix the amount with reasonable certainty. Moreover, the planer was operated in the interest of creditors; they should pay for the repairs.

### The Feed Bill for Live Stock.

The contention is that the amount due as per this bill should be taken from the proceeds of the sale of the immovable property.

There is no authority for charging this to immovable property, although it is said that this stock was sold as part of the realty. The effect would be, if this claim were allowed, that the mortgage creditor would have to pay an amount due for taking care of some of the property. It was necessary to feed these animals; some one had to pay for it. The amount was properly taken from the cash on hand. The creditors cannot now have it charged to the immovable property, for we do not recall that the evidence shows that this live stock was not in some way necessary in operating the plant, in hauling the lumber and other similar work at the planer.

### Operating Expenses of Planing Mills.

The complaint of the opponents in regard to this item is that the amount charged is excessive. There was evidence introduced by opponents in support of the opposition to this claim.

Witnesses for the receiver also were heard.

The testimony is conflicting. The purpose, as stated in the opposition, was to have the amount deducted from the receiver's commission on the ground of his negligence.

The commission of the receiver is already sufficiently reduced.

We pass from this point without further comment, as it has no merit.

### Merchant's Privilege.

The amount allowed by the district court to Brown, Timmons & Co. et al. on the account of goods and merchandise advanced is the only claim before us. (The other claims for advances and merchandise were not allowed by the judgment of the district court and are not before us.) The other

merchants to whom there is an amount due have not appealed, and they have not answered the appeal. These last are passed over, and will not be noticed further.

With reference to the firm above named whose claim has been allowed by the district court, there is contradiction.

In the first opposition this firm claimed for goods and merchandise and groceries advanced to the Pleasant Hill Lumber Company during the six months next preceding the appointment of the receiver to enable it to continue to operate its business. They asked in this first petition to be recognized as creditors with a privilege. This firm subsequently filed an amendment in which it claimed, different from the first opposition, that it furnished money and necessary supplies to secure logs and timber to be cut into lumber by the sawmill.

There was a change as shown by the allegation above noted.

No objection was urged to the amendment. On the trial of the case the testimony was admitted without objection. That testimony did not identify the advances as made to the Pleasant Hill Lumber Company "to deaden, cut, haul, float or raft any logs or forest timber"; quoting from Act No. 33 of 1882.

One of the witnesses, a member of the said firm, said that the orders furnished by his firm were filled for supplies to laborers employed at the mill.

If advances were made to laborers at the mill they were not advances made to fell trees and cut them into logs, and haul them away.

Another point is urged by the receiver and others to this claim. It is that the logs were brought to the mill and were sawed into lumber.

In considering this last point we find as a fact that the lumber was indifferently identified as the lumber from the logs. The testimony is not conclusive about this lumber.

The serious ground at this time is that, the logs having been sawed into lumber, the privilege was lost. In deciding, we will have to refer to section 1 of act No. 33 of 1882, cited supra. It provides for a privilege to secure supplies bearing upon the logs cut. The title and the act describe the privilege and the property specifically, but nothing is said of lumber. It is confined exclusively to the logs; i. e., to a privilege on the logs for labor done in cutting them into logs.

It has been decided repeatedly that privileges are stricti juris. Words cannot be supplied in order to recognize a privilege. But "lumber" (specific property) is not to be implied as having been intended by the legislator. Had he so intended he could easily have added the word "lumber," and would not have limited the statute to logs.

Counsel for this firm compare this asserted privilege to the privilege granted to the merchant and factor for money adanced to make and cultivate the crop of cotton. This last-mentioned privilege follows the product after it has been gathered, ginned, and baled, and has gone to the machine which separates the seed from the lint, thereby converting the raw material to another without a change of the thing itself.

The marked difference between this illustration of the learned counsel for the firm consists in the fact that "crop" is a general term, and includes cotton in the field as well as cotton after it has been ginned and baled, while the term "log" is limited in its meaning. After it is converted into lumber, lumber does not include the logs.

The same is true of crops of corn and cane. After the corn is gathered and put in sacks, it is still the crop, and the privilege follows the corn as well as the cane after it is ground into sugar, if it can be identified.

### The Claim of J. A. Selvy.

This claim is for $13,375.35. This creditor was president of the insolvent company.

It figures on the account as an ordinary debt of the receiver.

The objection urged in argument by the McCullough-Weaver Lumber Company, opponents, was that no evidence was offered in support of this item.

It is sustained by the receiver's oath.

We think that this account has been sufficiently proven.

The opponents just named admit that there was no specific opposition to this particular item. They claim the right to oppose this claim under some general averment in one of the oppositions.

We have carefully read those oppositions, and have not found any that we consider as directed against this claim.

But be that as it may, in answer to another contention of these opponents that this claim should not be paid until all the other creditors are paid, that it is not right or equitable that the stockholders in the enterprise be paid concurrently with the creditors.

We will state that the decisions of this court, two in number, the Cahill Case, 47 La. Ann. 1487, 17 South. 784; Cochran & Ocean Dry-Dock Co., 30 La. Ann. 1365, are not as far-reaching as opponents contend. The underlying idea in each of these cases was that the stockholders have no right to enter into a combination to obtain an advantage over creditors. That if they attempted it their claims would be subordinate to the claims of creditors.

But it is different as to the president of the company who has trusted his company for his salary or has made advances to the company to aid it; he should be paid if he has acted in good faith in the matter and only seeks his own, particularly when he claims as an ordinary creditor in insolvency proceedings.

### Taxes and Insurance.

The realty should pay its proportionate share of the taxes. The privilege for the taxes on the realty is superior to the vendor's privilege. It follows the lumber was assessed at $5,600 in 1907, and at $4,200 in 1908; the rate of taxation, the evidence shows, was 23 mills, making $128.08, plus $96.60, total, $225.40, which is deducted from the amount of taxes. The realty is charged with the balance, $890.66 plus $225.40, total, $1,116.06.

The realty will not be charged with the amount of premiums paid for insuring the lumber. This claim is not superior to the mortgage and vendor's privilege.

It is, therefore, ordered, adjudged, and decreed that the judgment appealed from be amended by rejecting the privilege claimed by the merchants on the lumber made from the logs.

The claim of the receiver, to be paid from the movable, is reduced, as mentioned in the body of the opinion.

The fee of the attorney for the receiver, also that portion to be paid from the movable, is prorated as in the body of the opinion.

The balance to be paid from the proceeds of the sale of immovable property.

It is ordered, adjudged, and decreed that the account be further amended by charging the immovable property with its proportion of taxes, as before stated, and the balance is to be paid from the proceeds of the movable property, also as above stated.

With these amendments, the receiver's account is homologated. The costs of appeal to be paid by the mass of the estate.