timation that Roberts ever saw her from 1925 until 1929.

Another thing which casts suspicion upon the testimony of Mrs. Reesha is that when her brother asked her in June, 1929, if she knew of any misconduct on the part of his wife, she did not then tell him of these acts of adultery about which she testified, but only told him that Roberts had visited the house and that she had gone out with him. It was only after Mrs. Andras filed this suit that Mrs. Reesha and her sister conveyed to him the stale and belated information that, back in 1925, his wife had committed adultery. The testimony is not convincing.

It is therefore ordered and decreed that the judgment appealed from be affirmed in so far as it rejects plaintiff's demands and orders her suit dismissed; and further ordered and decreed that the judgment in favor of defendant on his reconventional demand granting him an absolute divorce against his wife be reversed and set aside, costs to be paid by the appellant.

(136 So. 305)

**BANK OF COMMERCE & TRUST CO. v. BROWN COTTON OIL CO., Inc.**

**HARRINGTON v. BROWN COTTON OIL CO., Inc. (BANK OF COMMERCE & TRUST CO., Intervener).**

No. 27937.

March 30, 1931.

On Rehearing July 17, 1931.

Madison & Madison, of Monroe, for appellant.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for appellees Bank of Commerce & Trust Co. and Brown Cotton Oil Co.

OVERTON, J.

This is an appeal by J. H. Harrington, the third opponent in the first suit, named in the title, and the plaintiff in the second suit, named therein, from a judgment, rendered in favor of Harrington, in the second suit, against the Brown Cotton Oil Company, Inc., the defendant therein, for $843.32, with legal interest from judicial demand, dissolving a writ of sequestration that issued therein, and rejecting his demands in that suit in all other respects, and in the first suit, in which the Bank of Commerce & Trust Company is plaintiff, ordering the payment to plaintiff of the funds, retained therein by the sheriff, by virtue of an order, issued therein on Harrington's intervention in that suit, free from the claims of Harrington.

The litigation is the outcome of a claim of Harrington against the Brown Cotton Oil Company for a balance of $1850, for salary as manager and bookkeeper of that company, with 5 per cent. interest on $1,650 of that sum from judicial demand, and on $200 thereof from August 1, 1925, and for the balance of a claim for money lent by Harrington to the Brown Cotton Oil Company, amounting to $343.32.

The Brown Cotton Oil Company was organized in or about the summer of 1923. J. R. Brown, of Mansfield, La., was its president; M. C. Stockbridge of Shreveport, La., its vice-president and general manager; and J. H. Harrington, of Monroe, La., its secretary and treasurer. These officials neither received nor expected any salary as such. They, including Harrington, were also on the company's board of directors:

The company made rather extensive preparations to engage in business. It borrowed from the Bank of Commerce & Trust Company, for that purpose, $100,000, which it secured by mortgage on its plant at Bastrop, La. The suit, first named in the title, was brought to foreclose that mortgage. Harrington, who is an experienced cottenseed oil man, and a stockholder in the company, was employed as manager of the mill at Bastrop, at a salary of $250 a month. The company from the outset, due to unfavorable conditions in the market, did not succeed. It soon became probable that its continued operation

would result in failure, though the company thereafter continued to struggle for a while. After operating for about three months, it closed down, and did not thereafter engage in the manufacture of cottonseed oil, for the reason that it found itself unable to finance any longer its operations, but continued to sell, as occasion presented, what products it had on hand, and to prepare them for shipment. It still owed the Bank of Commerce & Trust Company the money that bank had lent the company.

About the time the company ceased operating, it was instrumental in having a warehouseman appointed, with whom it stored all of its products, though the products were not moved from the company's plant, for the warehouseman had no place convenient to store them. Negotiable warehouse receipts were issued by the warehouseman, and pledged by the company to the Bank of Commerce & Trust Company to secure better the company's indebtedness to the bank for the money lent the company, secured by mortgage. Harrington, at the time of the issuance of these receipts, knew nothing of their issuance until he returned to work after a protracted spell of illness. However, they were reissued in October, 1924, at which time, Harrington, acting under the directions of his superior officers, wrote out the new certificates and presented them to the warehouseman for his signature and accepted an appointment from him as his agent to take charge of the goods.

The privilege arising from the pledging of these certificates is asserted by the bank, in its intervention in the second suit, named in the title, against the privilege, claimed by Harrington, in that suit, for services performed.

In his intervention in the first suit, named in the title, Harrington asserts against the real property mortgaged the same privilege for services performed for the Brown Cotton Oil Company that he asserts against the cottonseed products, pledged. Harrington concedes in this court that he is not entitled to the privilege, as relates to the bank, on the real estate. Hence, the first suit, named in the title, passes out of this appeal, and leaves only the second.

There is no contest, in this court, concerning the item of $343.32, balance due for money loaned, for which no privilege is claimed. Harrington concedes that his salary of $250 a month was paid up to May 1, 1924, and there was never, in these proceedings, any claim for it. He claims, however, his salary for May and June, 1924. His salary for June, 1924, and for the following months, involved in this appeal, due to the condition of the Brown Cotton Oil Company, was, of his own motion, reduced to $200 a month. It is conceded, in this court, that the salary for these two months, amounting to $450, is due. However, the salary for July and August, 1924, and for the period from February 1, 1925, to July 1 of that year, amounting to $1,400, is in dispute here.

It will be observed that there is no claim for salary during the period, ranging from September 1, 1924, to February 1, 1925. During this period Harrington concedes that he was paid his salary by check, issued by the Warren Cotton Oil Company. Since, however, Harrington, in February, 1925, resumed work at the Brown Cotton Oil Company's plant, this circumstance is a matter of some importance in determining whether, upon his resumption of work there, his salary continued at $200 a month. It seems that during that period the Brown Cotton Oil Company had no particular need for Harrington. After first consulting him, Stockbridge, the company's general manager, secured a position to be filled by Harrington as purchaser

of cottonseed for the Warren Cotton Oil Company, and other mills, at $200 a month, a commission of $2.50 a ton, to be paid the Brown Cotton Oil Company, by those receiving the seed, on seed purchased by Harrington. These commissions, which the Brown Cotton Oil Company received, amounted to $1,748.15, or $748.15 more than Harrington's salary, during that period. We think that Harrington's connection with the Brown Cotton Oil Company, as an employee during that period, did not cease, and that, in the absence of anything to the contrary, when he resumed work at the Brown Cotton Oil Company's plant, he did so under a continuance of the same salary of $200 a month that prevailed before. Hence, we conclude, unless it should appear that he agreed to work without salary for the period following his resumption of work at the Brown Cotton Oil Company's plant, that his salary for that period continued at $200 a month.

■ However, it is urged that Harrington and the remaining officials of the Brown Cotton Oil Company agreed, due to the financial condition of the company, to accept no salaries for their work. If this means salaries for discharging the duties of their respective offices, created by the charter or by-laws of the company, none of them, including Harrington, so far as we know, either received or is claiming any. But the position taken does not mean that. As there is evidence both ways, the answer to the question, whether Harrington so agreed or not, is dependent upon where lies the weight of evidence. We think the weight of evidence is to the effect that Harrington did not so agree. The company needed some one at the plant to assist the general manager, who was absent, in making sales, to prepare articles sold for shipment and to attend to their shipment, to make the proper entries in the books, and to collect accounts. There was no one at the plant but Harrington and the night watchman, at least, most of the time, and of the two, the former was the only one competent to do these things. It is true that Harrington was a stockholder in the company, but it is also true that he had, during the period in question, every reason to believe that his stock was practically worthless. It is also true that he did not have the means that would justify him in doing the work for nothing. The financial statements made by Harrington, and sent the general manager, were sufficient to indicate that Harrington was crediting himself with salary after the asserted agreement to charge none, and no complaint was received. Our conclusion is that the evidence does not establish the waiver of salary claimed, and that Harrington is entitled to the $1,400 salary in contest, and that this, added to the $450 salary, not contested in this court, entitles him to judgment for salary against the Brown Cotton Oil Company for $1,850, the full amount claimed therefor. This sum, when added to the $343.32, not contested in this court, for money lent, entitles Harrington to a total judgment against the Brown Cotton Oil Company of $2,193.32, with interest.

■ It must now be determined whether Harrington is entitled to a privilege on the products of the plant seized by him under the writ of sequestration for his salary, and, if so, whether he is entitled to payment in preference to the Bank of Commerce & Trust Company. He does not claim a privilege for the $343.32, due for money lent, nor does he claim one, as against the bank, for the salary for any other months than the months of May, June, July, and August, 1924, which is for the first four months, covered by the claim for salary.

The privilege is asserted under article 3214 of the Civil Code, giving to clerks, secretaries, and other agents of that sort a privilege for their salaries for the last year elapsed, and so much as has elapsed for the current year. As to whether a person comes within this classification depends, not upon the name given to the position held by him, but upon the character of the duties he is expected to discharge and does discharge. Tete v. Lanaux, 45 La. Ann. 1343, 14 So. 241.

The mill was not operated during the period for which the privilege was claimed, and for some little time before. Therefore, there was not any occasion for the discharge of the duties of a manager, properly speaking. Harrington was, during that period, as disclosed by the record, called upon to keep an inventory, to take care of the property, to fill orders, under the instructions of the general manager, to prepare the products for shipment, to collect accounts, to make entries in the books, and the like.

In the Succession of Caldwell, 8 La. Ann. 42, it was held that the head clerk and manager of a bar room and eating house came within the foregoing classification, and was entitled to the privilege granted. The same may be said of a clerk and bookkeeper. In re Pleasant Hill Lbr. Co., 126 La. 743, 52 So. 1010. The same may be said of a vice president and stockholder of a corporation, employed by it as a salesman. Friedrichs v. Friedrichs, Young & Taney, 126 La. 689, 52 So. 996. The same is true of a clerk, though designated in the agreement as a broker. Tete v. Lanaux, 45 La. Ann. 1343, 14 So. 241. The goods, though in effect pledged, by the pledging of the warehouse receipts, still belonged to the Brown Cotton Oil Company, and so long as that company remained the owner of them the privilege, here claimed, might at-

tach to them. We think that Harrington is entitled to the privilege for the salary of $850, covering the months stated.

As to whether Harrington is entitled to be paid by preference over the Bank of Commerce & Trust Company is the next question presented for decision. While the goods, against which the warehouse receipts were issued, so far as the outside world could see, were not placed in a warehouse, but remained where they always were, and, while Harrington knew nothing of the issuance of the first receipts, at the time they were issued, yet he did learn of their issuance upon his returning to work after his illness, and by his acts recognized the validity of the issuance of the certificates and of the pledging of the same, by acting under the certificates and pledge in accordance with their intent and purpose, and in accordance with instructions received from the Brown Cotton Oil Company and the bank. Therefore, Harrington is in no position to attack the validity of the issuance of the certificates and of the pledging of the same, and the estoppel pleaded against his doing so should be sustained.

It was during this period that the claim arose for which Harrington claims a privilege; that is to say, when Harrington reappeared to earn the salary for which he now claims a lien, the certificates had been issued and pledged. Hence, the privilege claimed by the bank was in existence before Harrington's claim, for which he claims a privilege, arose. The reissuance of the certificates after Harrington's claim arose, for which he claims a privilege, did not destroy the continuity of the bank's privilege. They were reissued merely to replace the old, in a corrected form, as some of the property, described in them, had been sold.

While it is held that where a privilege exists—in that case the privilege of the fur-

nisher of supplies—before the issuance of the receipts, the privilege primes the rights of the holder of the receipts (Purity Feed Mills Co. v. Moore, 152 La. 393, 93 So. 196), yet we have no such case here, but have the opposite. Under the circumstances, there appearing to be no provision of law, giving to clerks, secretaries, and other agents of that kind a privilege, priming, under all circumstances, the pledge of warehouse certificates, we think that the privilege of the bank is superior to the privilege claimed by Harrington.

■ The judgment appealed from will have to be amended as indicated in the decree. As Harrington has a privilege on personal property, technically, he is entitled to have the writ of sequestration sustained, although the bank is entitled to payment by preference over him.

For the reasons assigned, the judgment appealed from is amended by increasing the judgment against the Brown Cotton Oil Company, Inc., to $2,193.32, with legal interest on $1,993.32 thereof from judicial demand, and with like interest on the balance thereof from August 1, 1925, until paid; by allowing John H. Harrington the privilege claimed by him on said property sequestered, to the extent of said sum of $850, with legal interest thereon from judicial demand; sustaining, to that extent, the writ of sequestration that issued herein, and recognizing that the privilege of the intervener, the Bank of Commerce & Trust Company, is superior to and entitled to payment by preference over the privilege of said Harrington. In all other respects the judgment appealed from is affirmed, the costs of appeal to be paid by the Brown Cotton Oil Company.

On Rehearing.

ROGERS, J.

■ The sole question on rehearing is whether the privilege of appellant Harrington is superior to the privilege of appellee Bank of Commerce & Trust Company on the cottonseed products sequestered herein. Appellant's privilege is for four months' salary amounting to $850 earned as an employee of the Brown Cotton Oil Company, Inc. Appellee's privilege arises under negotiable warehouse receipts which it holds as pledgee to secure an indebtedness due by the Brown Cotton Oil Company, Inc.

Appellant admits that if the appellee bank had retained the original receipts his privilege would be subordinated to its privilege as pledgee. But appellant earnestly contends that because, the bank exchanged the old receipts for the new receipts covering the same property, except the part which had been sold, the lien arising under the pledge of the old receipts was extinguished, thereby ranking his intervening privilege for salary above appellee's privilege as pledgee of the new receipts.

The disputed question has not been adjudicated upon by the courts of this state, and only a few cases have been presented in other jurisdictions in which a somewhat similar question has been involved.

Appellant argues the case is analogous to the cancellation of a mortgage (meaning a mortgage on real estate) and the taking of a subsequent mortgage after an intervening mortgage has acquired priority. But the suggested analogy is not quite appropriate. The essential difference in the two cases is that which exists between a mortgage and a pledge.

A real mortgage exists only on immovables, ships, steamboats, etc., while a pledge has for its object only movables, corporeal and incorporeal. The real mortgage only subjects to the right of the creditor the property on which it is imposed, without the necessity of

his having actual possession. Under a pledge the movables subjected to it are placed in the possession of the creditor or of a third person agreed upon by the parties. Civ. Code, art. 3281. And among creditors the mortgage has force only from the time of its recordation. Civ. Code, art. 3329.

The question is one of registry plus the intention of the parties. It is fundamental that parties dealing with real estate are entitled to rely entirely on the records.

When a mortgage is properly released by the holder, it is obvious that it is his intention to extinguish the obligation. And a second mortgage holder, or any other person acquiring rights on the property, has the legal right to assume that such was the intention.

In the present case, the appellee bank had no intention to release its rights. It never relinquished its control of the cottonseed products subjected to its pledge. There was no formal cancellation of its privilege, but a continuity of privilege on the goods evidenced by a different or new piece of paper. And there is no conflict between the receipts. One certifies that on a certain date the warehouse-man holds certain property for account of a particular party. The other certifies that on a later date the warehouseman holds the same property, less that which had been disposed of, for the same party. Therefore, it is obvious it was the clear intention of the parties that the substitution was merely for convenience in handling the certificates. And the privilege was a continuous one which was never released either expressly or impliedly.

This view of the case is supported by the decision of the Court of Appeals of the State of New York in the case of N. Y. Security & Trust Co. v. Lipman, 157 N. Y. 551, 52 N. E. 595, wherein it was expressly held that the lien of a pledgee of negotiable warehouse receipts in the name of the pledgor is not affected by their exchange for a single receipt covering the same property in the name of the pledgee.

Appellant cites in support of his contention Doherty v. Merchant's National Bank, 52 S. W. 832, 21 Ky. Law Rep. 628; Roche v. Crigler, 67 S. W. 273, 23 Ky. Law Rep. 2378; Boas v. De Pue Warehouse Co., 69 Cal. App. 246, 230 P. 980. But neither of these cases is authority against the claim of tracing back asserted by the appellee bank.

In Doherty v. Merchant's National Bank, the bank surrendered its old receipts and took new receipts as security for a loan. The old receipts were subsequently fraudulently reissued to other parties. In these circumstances, the court held the lien of the bank under the exchange of the receipts to be good.

In Roche v. Crigler, the court found a deficiency of proof of the delivery of either the old or the new receipts to the party who attempted to trace back to the original receipts. This was the real ground of the decision in favor of the holder of the intervening receipts.

In Boas v. De Pue Warehouse Co., the dispute was over nonnegotiable warehouse receipts.

Nor so far as we have been able to find is there any conflict between our views and the provisions of the Uniform Warehouse Receipts Act (Act No. 221 of 1908). Section 12 of the statute is not regulatory of the rights of parties asserting conflicting privileges under warehouse receipts. Its declared purpose is to impose upon the warehouseman, under penalty of being responsible for the omission, the duty of canceling or marking on negotiable receipts all goods covered thereby which are withdrawn from his custody.

For the reasons assigned, our former decree is reinstated and made the final decree in this case.